**Shirley WILDER, et al.,**
**Plaintiffs–Appellees,**

v.

**Blanche BERNSTEIN, Individually and as Administrator of the New York City Human Resources Administration, et al., Defendants–Appellees,**

**Abbott House, et al.,**
**Intervenors–Appellees,**

**Paula Rabinow, Individually and as Director of the Joint Planning Service, et al., Appellants.**

**Nos. 1404, 1405 and 1406, Dockets 87–7406, 87–7408 and 87–7410.**

United States Court of Appeals, Second Circuit.

Argued June 24, 1987.

Decided June 8, 1988.

Andrew Irving, New York City (Michael N. Rosen, Maxine Fass, Robinson, Silverman, Pearce, Aronsohn & Berman, New York City, on the brief), for appellant Goldsmith.

Gerald E. Bodell, New York City (Bodell & Gross, New York City, on the brief), for appellants Schneider, Levine, Trobe, Demartino, Rabinow, Barry, Sheridan, Starace, and Quinn.

Richard E. Nolan, New York City (James S. Goddard, Davis Polk & Wardwell, New York City, on the brief), for appellants Howard, Francene, Sheila, Apers, O'Neill, White, McCormack, Breen, Foley, Chillion, McNaughton, James, Chrysostom, Fogarty, Wallace, Fontaine, McMahon, Patrick, Mary Sheila, Trager, Meaney, Olivia, Harris, and Altheimer.

Marcia Robinson Lowry, New York City (Christopher A. Hansen, David B. Goldstein, American Civil Liberties Union, New York City, on the brief), for plaintiffs-appellees.

Elizabeth Dvorkin, New York City (Peter L. Zimroth, Corp. Counsel, Leonard Koerner, June A. Witterschein, Diane J. Morgenroth, Lucy A. Cardwell, New York City, on the brief), for municipal defendants-appellees.

Mark J. Bunim, New York City (Ivy S. Fischer, Ohrenstein & Brown, New York City, on the brief), for defendant-appellee Kaufman.

Stephen Wise Tulin, New York City (Polier, Tulin, Clark & Zalk, New York City, Donald J. Cohn, Seth M. Lahn, Webster & Sheffield, New York City, on the brief), for intervenors-appellees.

Joseph W. Bartlett, Gaston Snow Beekman & Bogue, New York City, filed a brief for amici curiae Federation of Protestant Welfare Agencies, et al., and a brief for amici curiae Community Service Soc. of New York, et al.

Beth Otten, Roger K. Evans, Dara Klassel, New York City, Laura R. Rockett, Raggio, Jaffe & Kayser, New York City, filed a brief for amici curiae Planned Parenthood Federation of America, Inc. and Planned Parenthood of New York City Inc.

Before NEWMAN, KEARSE, and CARDAMONE, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal challenges the settlement of a class action that effects major changes in the way New York City discharges its obligations to arrange for the care of children requiring placement in institutions and foster homes. Because New York City has historically contracted with religiously affiliated child care agencies to provide placement for most of the children requiring

institutional and foster home settings and because New York law provides for religious matching of children and sectarian child care agencies, the lawsuit posed troublesome issues arising under both the Establishment of Religion and the Free Exercise of Religion Clauses of the Constitution. The suit also raised serious issues under the Equal Protection Clause and related statutes arising from alleged inequality of treatment based on the race of the children. The settlement has been achieved between the plaintiffs, representing a class of Black Protestant children, and the defendant municipal officials responsible for the City's child care system (collectively "the City"). The settlement has also been agreed to by a group of private child care agencies, which intervened in the District Court, initially to oppose the settlement. The settlement was opposed in the District Court and now on appeal by a group of administrators of private child care agencies that characterize themselves as "Catholic and Jewish affiliated" agencies. Brief for Defendants–Appellants Schneider et al. at 1. These administrators (hereinafter "the sectarian agencies") were defendants in the District Court but were dismissed as parties when the settlement was approved. Officials of New York State, who were defendants, were dismissed as parties after advising the District Court that they had withdrawn their objections to the settlement.

The appeal, brought by the sectarian agencies, is from the April 28, 1987, judgment of the District Court for the Southern District of New York (Robert J. Ward, Judge), giving final approval to the settlement. The settlement had been initially approved by Judge Ward on October 8, 1986, subject to compliance with four conditions. The final judgment ruled that the conditions had been met. Judge Ward's opinion giving initial approval to the settlement, reported at 645 F.Supp. 1292, is notable for its thoroughness, craftsmanship, scholarship, and sensitivity to the issues presented. Familiarity with that opinion is not only assumed, it is virtually indispensable to an understanding of this appeal. Indeed, in light of its thoroughness, we need only summarize the complex background of this litigation and the provisions of the settlement before turning to the appellants' contentions.

## Background

Under New York law children are "placed" in institutions or foster care homes by one of two procedures. Some are taken away from their parents upon a finding by the Family Court of abuse or neglect, N.Y. Family Court Act, Art. 10 (McKinney 1983); others are voluntarily committed by parents, N.Y. Soc. Serv. Law § 384–a (McKinney 1983). In both situations the child is placed in the custody of the New York City Commissioner of Social Services. About 17,000 children are currently in placement.

New York City has the option of caring for these children in its own facilities or contracting with private agencies. In pursuance of a long tradition, it has elected to rely heavily on private agencies. At present more than 90% of the children are placed through private agencies. The City contracts with some 60 private agencies. Most of them are religiously affiliated. These agencies place the child either with a foster family or in an institution run by the agency, depending on the child's needs. About 70% of the children are in foster homes. About 90% of the per diem expenses of the children are paid to the agencies from federal, state, and city funds.

The religious matching aspect of New York's child care scheme is set forth in state constitutional and statutory provisions. The State Constitution provides that a child shall be placed "when practicable, in an institution or agency governed by persons, or in the custody of a person, of the same religious persuasion as the child." N.Y. Const. art. 6, § 32 (McKinney 1987). The primary implementing statute provides that a commitment shall be made "when practicable, to an authorized agency under the control of persons of the same religious faith as that of the child." N.Y. Soc. Serv. Law § 373(1) (McKinney 1983). The statute further provides that it shall be applied "so far as consistent with the best interests

of the child" and "where practicable ... so as to give effect to the religious wishes" of the parents. *Id.* § 373(7). In the absence of the parents' expressed wishes, "it shall be presumed that the parent wishes the child to be reared in the religion of the parent." *Id.*

These religious matching provisions were authoritatively construed by the New York Court of Appeals in 1972. *In re Dickens v. Ernesto,* 30 N.Y.2d 61, 330 N.Y.S.2d 346, 281 N.E.2d 153, *appeal dismissed for want of substantial federal question,* 407 U.S. 917, 92 S.Ct. 2463, 32 L.Ed.2d 803 (1972). Considering the provisions in the context of an adoption, the Court said that the statutes "place[ ] primary emphasis on the temporal best interests of the child, although the religious preference of the natural parents remains a relevant consideration." *Id.* at 66, 330 N.Y.S.2d at 348, 281 N.E.2d at 155. "[R]eligion," the Court continued, "is but one of many factors in the placement of a child," and a religious placement, "though desirable, is not mandatory." *Id.* at 65–66, 330 N.Y.S.2d at 348, 281 N.E.2d at 155.

The pending litigation, brought initially to challenge the state law provisions regarding religious matching in connection with publicly funded child care placements, was initiated in 1973. Subsequently, a three-judge district court was convened pursuant to 28 U.S.C. § 2281 (repealed 1976). The three-judge court confined its decision to the facial validity of the challenged state constitutional and statutory provisions and concluded that they did not violate the Establishment Clause of the First Amendment. *Wilder v. Sugarman,* 385 F.Supp. 1013 (S.D.N.Y.1974) (per curiam) (*Wilder I*). Since the Court's reasoning bears on issues raised in the pending appeal, it must be set forth, at least briefly.

The Court initially analyzed the Establishment Clause claim under the three-part test of *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971):

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that nei-

ther advances nor inhibits religion, *Board of Education v. Allen,* 392 U.S. 236, 243, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060 (1968); finally, the statute must not foster "an excessive government entanglement with religion." *Walz* [*v. Tax Commission,* 397 U.S. 664,] 674 [90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970)].

Viewing the state law provisions for funding and religious matching as part of an integrated scheme, the three-judge court in *Wilder I* concluded that the scheme did not have a solely secular purpose and did have an effect that, "[a]bsent countervailing circumstances, ... could be to impermissibly inculcate religion." 385 F.Supp. at 1023–24. However, the Court concluded, such countervailing circumstances arose out of the State's obligation, once it accepted the responsibility for caring for the children in the place of their parents, to enforce the parents' right to determine the religious upbringing of their children, *see Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), and to assure the children's rights under the Free Exercise Clause, *see Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). The Court analogized the situation to a state's responsibility to make provision for the religious needs of those in its care in prisons, hospitals, and military establishments. *See Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972) (per curiam) (prisons); *Katcoff v. Marsh,* 755 F.2d 223, 234–35 (2d Cir.1985) (military); *Carter v. Broadlawns Medical Center,* 667 F.Supp. 1269, 1280–81 (S.D. Iowa 1987) (hospital); *see also Abington School District v. Schempp,* 374 U.S. 203, 296–98, 83 S.Ct. 1560, 1610–11, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring). Finally, the Court considered the suggestion that the State could fulfill its obligations toward the parents and the children by placing the children in the care of non-religious agencies and then arranging for the religious needs of the children to be met outside the purview of the child care agencies. That option, the Court believed, would itself encounter Establishment Clause concerns because the State would become "hopelessly entangled in religion."

385 F.Supp. at 1029. Thus, obviously sensitive to the tension between the Establishment and the Free Exercise Clauses no matter how New York chose to meet the religious needs of children in its care, the Court upheld the statutory scheme on its face and deferred for further proceedings inquiry as to whether the implementation of any aspect of the scheme violated the Constitution.

After the decision in *Wilder I,* discovery ensued, and the complaint was amended several times. Ultimately a fourth amended complaint was filed in 1983, which set forth four claims that awaited trial at the time of the settlement. These were that the City's child care scheme (1) discriminates on the basis of race in that Black children are placed in disproportionately low numbers in Catholic and Jewish agencies, which tend to be the agencies that are better funded and provide higher quality services, (2) discriminates on the basis of religion in that, among other things, Protestant children wait longer for placement and are placed in inferior programs compared with Catholic and Jewish children, (3) involves an excessive entanglement of government with religion that violates the Establishment Clause, and (4) infringes the Free Exercise rights of Protestant children in that, among other things, there are no agencies operated by members of most of the Protestant sects and that Protestant children are chilled in the exercise of their own religion when placed in the care of Catholic and Jewish agencies. The matters alleged in the Fourth Amended Complaint were claimed to violate the First and Fourteenth Amendments, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1982), and New York anti-discrimination regulations, 18 N.Y.C.R.R. §§ 303.1, 303.2 (1978).

In April 1984 the plaintiffs and the City defendants presented a proposed settlement for approval by the District Court pursuant to Fed.R.Civ.P. 23(e). Judge Ward directed that notice of the proposal be given to members of the plaintiff class and subsequently granted leave to nineteen child care agencies to intervene for the purpose of opposing the settlement.

Thereafter the Court received detailed submissions concerning the settlement proposal from the parties, from organizations of child care professionals, and from knowledgeable individual experts. Hearings on the proposal began in August 1984 and continued intermittently as the proposal was revised in response to some of the objections. In January 1985 a revised proposal was submitted to the Court. After notice to the plaintiff class, this proposal was the subject of a hearing in March 1985. Prior to this hearing the State defendants had withdrawn their objections to the proposal. The intervenors withdrew their objections, subject to agreement on the identity of a child care expert who would perform certain tasks in the implementation of the settlement. Once agreement on that person was secured, the settlement was signed by the plaintiffs, the City defendants, defendant Kaufman (the administrator of Ohel Children's Home, an Orthodox Jewish agency), and the nineteen intervenors. On October 8, 1986, Judge Ward issued his opinion approving the settlement, subject to the fulfillment of certain obligations by some or all of the signatories. Once satisfied that these conditions, which are not relevant to this appeal, had been met, Judge Ward entered a final judgment approving the settlement and dismissing with prejudice the defendant sectarian agencies, all of whom had remained opposed to the settlement. These agencies, all Catholic and Jewish, are the sole appellants. Though not signatories to the settlement and not bound as parties by the judgment, they were parties in the underlying lawsuit and remain vitally interested in the judgment because they will be substantially affected by its implementation should they choose to remain participants in the City's program of purchasing child care services from private agencies. *Cf. Marino v. Ortiz,* —— U.S. ——, ——, 108 S.Ct. 586, 587, 98 L.Ed.2d 629 (1988) (persons who were never parties in district court and failed to intervene may not appeal settlement of class suit).

## The Settlement

The settlement proclaims its purposes to be the assurance of placement of children

without racial or religious discrimination and "appropriate" recognition of preferences for religious matching in a manner consistent with federal and state constitutions, statutes, and regulations. These purposes are implemented by an elaborate plan for child placement that requires the City to place children on a first-come, first-served basis, with a preference for religious matching honored only to the extent that it does not give a child greater access to a program appropriate for his needs over other children for whom the program is also appropriate but who earlier became candidates for placement.

The settlement recognizes that its attempt to provide equal opportunities for placement requires some system for determining the relative quality of various agencies that provide the services appropriate for any particular child. To this end, the settlement provides for classification of agencies and programs by one or more expert consultants to be selected by the City with the participation of plaintiffs' counsel and the signatory and nonsignatory agencies.

Once the classification has been made, the City will be required to place a child in the best available program appropriate for the child's needs. If the parents express a preference for a religious matching placement, the City will be required to place the child in the best available program of an agency with the preferred religious affiliation, provided there is a vacancy. If no vacancy exists, the parent then has a threefold option: (a) having the child wait until there is a vacancy in the best "in-religion" program, (b) having the child placed in the next best "in-religion" program, or (c) having the child placed in the best available "out-of-religion" program. The preference of a child over fourteen is to be given serious consideration. Exceptions to the first-come, first-served principle may be made for "compelling therapeutic reasons."

The settlement also permits an exception from its basic pattern to be made for children whose parents request placement in programs "specially designated" by the City to care for children of religious groups

with "adherents whose religious beliefs pervade and determine the entire mode of their lives, regulating it with detail through strictly enforced rules of the religion." The plaintiffs and the City contemplate that the Ohel Children's Home, which provides child care in an Orthodox Jewish setting, would be an agency falling within this category.

In order to meet concerns arising under the Free Exercise Clause, the settlement includes a "religious practices" section imposing requirements upon the City and all contracting agencies. As summarized by the District Court:

> Specifically, each agency would provide "comparable opportunities" for children to practice their own religion and observe religious holidays, would permit but not require children in its care to attend religious or holiday observances on its premises, would not impose religious dietary practices (to the extent practicable) on children who do not wish to follow them, would provide benefits and privileges to children without regard to religion, and would not convey religious tenets regarding family planning except in the course of providing religious counseling. SSC [Special Services for Children, the City's agency responsible for child placement] would ensure that all children have "meaningful access to the full range of family planning information, services and counseling" through the agency or an outside source or both. Religious symbols would be permitted in children's rooms at their request; agencies would not display "excessive religious symbols."

645 F.Supp. at 1306–07 (quoting stipulation for settlement) (citations to settlement paragraphs omitted).

The settlement is to last for three years after full implementation of the classification system or five years after entry of the stipulation on which the settlement is based, whichever is sooner. This Court granted a partial stay of the final judgment pending appeal, permitting the City to proceed with steps preparatory to implementation of the settlement but deferring those

aspects of the settlement that change the placement system.

## Discussion

The standards for assessing a consent decree in a class action are well known, *see Malchman v. Davis*, 706 F.2d 426 (2d Cir. 1983); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir.1974), and were faithfully applied by the District Judge, *see* 645 F.Supp. at 1307–08. We focus our attention on the specific objections pursued by the appellants on this appeal and also consider one aspect of the decree—its enforceability—on our own motion. The appellants advance essentially four objections to the settlement: (1) that it should not have been approved in the absence of a prima facie case of discrimination because it adopts race-conscious remedies, (2) that it violates New York requirements for religious matching, (3) that it infringes the free exercise rights of the children and their parents, and (4) that it will precipitate excessive entanglement between government and religion in violation of the Establishment Clause.

1. *Lack of evidence to justify race-conscious remedies.* Appellants rely on *Kirkland v. New York State Dep't of Correctional Services*, 711 F.2d 1117 (2d Cir.1983), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984), for the proposition that approval of a settlement containing race-conscious remedies requires examination of whether "there is an existing condition which can serve as a proper basis for the creation of" such remedies. *Id.* at 1129. The requisite factual showing of discrimination warranting such remedies, they contend, is lacking. The argument attacks a straw man, for nothing in the settlement may fairly be characterized as a race-conscious remedy. There is no requirement that any agency reserve a specific number of beds or foster homes for members of any racial group, nor even that affirmative steps be taken for the purpose of increasing the number of children of any racial group placed with an agency. The purpose of the settlement is to insure that children are placed in the best available facilities explicitly *without* regard to their race. Nothing in the decree requires that any child be placed in any agency because of that child's race. It may well be that observance of the first-come, first-served principle will eliminate whatever racial discrimination, intentional or inadvertent, may have been occurring in the past. But a remedy that precludes consideration of race, thereby permitting placements with each agency to approach, over time, the racial composition of the child care population, is the antithesis of a race-conscious remedy.

The basis for the appellants' claim of race-conscious remedies is the requirement that statistics be maintained as to the race and religion of the children placed with each agency. Contrary to the appellants' contention, this requirement is not intended to force each agency to take its proportionate share of each racial and religious group. The statistics serve the entirely permissible purpose of providing a basis for determining whether, despite the non-discriminatory objectives of the decree, some discrimination is in fact occurring.

Expanding their contention that the settlement adopts a race-conscious remedy, the appellants contend that it will result in reverse discrimination of a type proscribed by cases such as *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Since no quota has been imposed upon any agency to take any prescribed number of children of any particular race or religion, *Bakke* is not remotely applicable. Appellants' claim of reverse discrimination is in reality only another way of describing the fact that a prohibition against discrimination on the basis of race or religion tends over time to result in a distribution among the relevant entities—here, child care agencies—of members of racial and religious groups approximately proportional to their numbers in the relevant population. It is a perversion of the term to call this "reverse discrimination." To the extent that the appellants are really complaining about the prospect that Catholic and Jewish children might be placed in Catholic and Jewish agencies less frequently than occurred in

the past, the claim will be considered subsequently when appellants' Free Exercise Clause contentions are examined.

■ 2. *Violation of New York religious matching requirements.* Though not decisive, we note preliminarily that the responsible litigating officers of New York State have withdrawn their objections to the settlement, thereby casting considerable doubt on appellants' claim that the settlement violates New York's constitutional and statutory provisions for religious matching. As previously pointed out, these provisions, as authoritatively construed by the State's highest court, do not mandate religious matching in all circumstances. The principal criterion for placement is the best interests of the child, a criterion the settlement scrupulously observes. Moreover, the settlement requires that religious matching be accorded a high priority in the placement decision. The parents' preference for a religious placement must be honored unless such a placement would be detrimental to the child's needs or the agency has no opening. Even then, the parents' options include waiting for placement in the best in-religion program or accepting immediate placement in the next best in-religion program with a vacancy.

The appellants' claim of state law violation centers essentially on the dynamics of the settlement whereby in-religion placements in the best programs of agencies affiliated with some religions will sometimes be unavailable because those programs will be filled due in part to the influx of children of other religions. In essence, appellants are contending that the only lawful way to comply with New York's religious matching provisions is to permit each religious agency either to maintain vacancies in its programs to accommodate children seeking in-religion placements or at least, when full, to reject children of other religions and limit its waiting list to children of its own religion. We see nothing in the New York provisions, as construed in *Dickens v. Ernesto, supra,* to support such an interpretation. Consonant with New York law, the settlement accords priority to religious matching

when placement opportunities serving the child's best interests are available. State law does not require either holding such opportunities open for children of a particular religion or according such children an assured place at the head of an agency's waiting list.

3. *Infringement of free exercise rights.* We encounter the same difficulty faced by Judge Ward in understanding precisely in what respect the appellants contend that parents or children are likely to be denied their rights under the Free Exercise Clause. Manifestly, nothing in the settlement in any way purports to impair the right of any person to maintain his or her religious beliefs. Enlisting *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Hobbie v. Unemployment Appeals Commission,* 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987), the appellants appear to suggest that the settlement somehow obliges parents or children to forgo some aspect of religiously based conduct in order to obtain some governmental benefit. No such conduct has been identified. The settlement does not oblige any child to refrain from any aspect of religious observance, nor to take or refrain from taking any step inconsistent with religious tenets.

■ The consequence of the settlement most criticized by the appellants is its tendency to reduce the frequency of in-religion placements. Appellants do not contend, however, that every child in need of institutional or foster care has a constitutional right to have that care provided by an agency of the child's religion. The context in which this lawsuit arose and has been settled differs significantly from the context of religiously affiliated private education voluntarily selected by parents. *See Pierce v. Society of Sisters, supra.* It is one thing to recognize the right of parents to choose a religious school for their children as a private alternative to meeting state-imposed educational requirements in public schools. It is quite another matter, however, to suggest that parents who are unable to fulfill their parental obligations, thereby obliging the state to act in their

stead, at their request or involuntarily, nonetheless retain a constitutional right to insist that their children receive state-sponsored parenting under the religious auspices preferred by the parents. So long as the state makes reasonable efforts to assure that the religious needs of the children are met during the interval in which the state assumes parental responsibilities, the free exercise rights of the parents and their children are adequately observed.

■ We agree with the appellants that the first-come, first-served principle is likely to reduce the frequency of in-religion placements, especially with respect to Catholic and Jewish agencies, because preferred agencies will sometimes have no vacancies. This prospect, though doubtless contrary to the preferences of many Catholic and Jewish parents whose children will require placement, is not a denial of their free exercise rights. Indeed, as often happens in litigation arising under the religion clauses of the First Amendment, it is the effort of the settlement to safeguard the children's free exercise rights that encounters the appellants' final objection concerning the Establishment Clause.

4. *Establishment of religion.* In considering appellants' final contention—that the settlement violates the Establishment Clause—it is worth recalling that this lawsuit was originally brought by plaintiffs who objected on establishment grounds to the basic arrangement whereby New York City purchases child care services from religiously affiliated private agencies. Not surprisingly, the appellant agencies, who wish to continue receiving public funding for their services under the scheme prevailing before the settlement, make no establishment objection to their receipt of public funds. Instead, the appellants contend that the settlement will precipitate a degree of entanglement between government and religious agencies that exceeds the permissible limit of the Establishment Clause. In making this argument, the appellants are obliged to walk a very fine line. They accept the degree of state entanglement with religion that accompanied the funding and placement scheme prior to the settle-

ment. They acknowledge, as did the three-judge court in *Wilder I,* that when government discharges its responsibilities in the field of child care, in substitution of parents unable to perform their parental duties, some governmental activity that might otherwise overstep the Establishment Clause becomes constitutionally permissible because of the need to vindicate the free exercise rights of the children. At the same time, the appellants contend that the particular arrangements contemplated by the settlement to assure the protection of the children's free exercise rights require an extra degree of entanglement that is constitutionally impermissible. In essence, appellants say the entanglement that occurred before the settlement was at the allowable limit, but whatever the settlement adds beyond the prior placement scheme goes too far.

In making this delicately balanced argument, the appellants do not precisely identify the "extra" aspects of entanglement to which they object. They contend generally that the settlement involves, "under the District Court's auspices, either the City, the ACLU [which represents the plaintiff class], or both, in, among other things, the placement of children in care of agencies under the same religious auspices as the religion of the child, the determination of parental preference as to religion, and the religious practices of children while in care in voluntary agencies." Brief for Appellants Goldsmith et al. at 65–66. Yet the appellants vigorously support the City's obligation under state law to observe parental perferences for religious matching where "practicable." The appellants do not indicate how the City is to assure that parental preferences for religious matching are ascertained and honored to the extent "practicable" without having the City "involved" in these matters. And while the appellants appear to acknowledge that any program using public funds for child care placements with religiously affiliated agencies must provide sufficient free exercise safeguards to overcome establishment concerns, they do not identify which aspects of the settlement they consider to be "extra" safeguards of free exercise rights that will

precipitate an impermissible degree of entanglement.

In making our own effort to determine whether the detailed provisions of the settlement overstep the limits of permissible entanglement, we are guided by two related considerations. First, the difference we have previously noted between the contexts of private religious schools and of private religious child care agencies has an important bearing on the entanglement issue. Private religious schools are an option available to parents who choose not to educate their children in public schools. The extent to which government may become entangled in the affairs of those schools in the course of endeavoring to provide financial assistance and other resources has been a continuing concern to the Supreme Court in its effort to enforce the First Amendment precisely because the state's extension of such financial assistance is gratuitous. The state entirely discharges its obligation to the education of children by funding public schools and affording parents the option of paying for religiously affiliated education outside the public schools. In that context, the Supreme Court has drawn the line against impermissible entanglement somewhat rigorously. *See Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985); *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Lemon v. Kurtzman*, *supra*.

■ In the child care context, however, the state has a responsibility to act for the parents when the parents are unable to discharge their own responsibilities. Yet in exercising its responsibilities the state must take some steps to assure that the religious needs of the children are met. Providing funds or other assistance for this religious component of the parental obligations that the state has assumed is not gratuitous. The state must either concern itself with the children's religious needs directly or provide funds to assure that these needs are met under the auspices of private agencies. There will be some degree of entanglement however the state elects to discharge this responsibility. The

entanglement standard cannot be applied as rigorously in this context as in the context of aid to private religious schools. *Cf. Katcoff v. Marsh, supra*, 755 F.2d at 234–35 (Establishment Clause standard applicable to attack on military chaplaincy must account for "necessity of recognizing the Free Exercise rights of military personnel"); *Abington School District v. Schempp, supra*, 374 U.S. at 296–98, 83 S.Ct. at 1610–11 (Brennan, J., concurring) (establishment concerns may need to give way to free exercise interests in military and prison settings).

■ Second, the considerations that have impelled the Supreme Court to be rigorous in setting entanglement limits in the religious school context have led to a readiness to assess entanglement objections on the basis of what conduct is likely to occur rather than what conduct has in fact occurred. That was the approach taken in *Aguilar*, *Meek*, and *Lemon*. Since the state was under no obligation to provide any resources in the context of religiously affiliated education, the Court saw no need to accept the risk that provisions that appeared to precipitate excessive entanglement would actually do so in practice. In the context of child care, however, where the state is obliged to act one way or the other to meet religious needs, it is entirely appropriate to accept some risks and assess entanglement primarily on the basis of what occurs in fact, not what is apprehended to occur. Indeed, to assess provisions in this context on the basis of the entanglement that *might* occur runs the unacceptable risk of invalidating some arrangements that would in practice be permissible, with the ultimate result that the state's ability to meet the religious needs of the children for whom it has undertaken to provide care will be seriously impaired. Of course, even in the child care context some arrangements may so inevitably lead to impermissible entanglement that there is no need to await their implementation before recognizing their invalidity. The deficiency of such provisions, however, will normally be readily apparent.

With these considerations in mind, we agree with Judge Ward that the settlement on its face does not exceed an entanglement standard appropriate to the context of state-sponsored child care in substitution of the responsibilities of parents. We acknowledge that some of the provisions pose a risk of excessive entanglement. For example, we are apprehensive about the implementation of paragraph 70(9) of the settlement prohibiting agencies that contract with the City from displaying "excessive" religious symbols. Sensitive to the risk that this provision could be interpreted to lead to an unacceptable degree of intrusion by City officials into the management of the property of religious agencies, Judge Ward wisely narrowed the scope of the provision so that it is enforceable only "where plaintiffs can demonstrate that a religious symbol or aggregation of symbols displayed in the common areas of a child care agency has the effect of impermissibly chilling the Free Exercise rights of children in the agency's care." 645 F.Supp. at 1329.

Even that narrowed construction, however, does not eliminate the risk of impermissible entanglement in the course of enforcing the provision. Nevertheless, we do not believe the provision is inherently vulnerable, and we believe it prudent to await whatever implementation of the provision may occur, if any. It is by no means certain that the plaintiffs will even attempt to require a detailed measurement of the extent to which religious symbols are displayed, much less precipitate litigation as to whether the display of any particular symbol can be said to be "excessive." In practice, the provision itself may well be only a symbol, reminding the religious agencies that their acceptance of public funds while providing services to children of different religions carries with it an obligation to avoid proselytizing efforts that would make the children feel uncomfortable and unwelcome and that would threaten their rights under the Free Exercise Clause.

5. *Enforceability of the decree.* In addition to the objections of the appellants, we raise on our own motion a concern as to whether in some respects the provisions of the settlement are too imprecise to be included in an enforceable decree. An injunctive order must be framed "so that those who must obey [the order] will know what the court intends to require and what it means to forbid." *International Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967); *see also Schmidt v. Lessard,* 414 U.S. 473, 476, 94 S.Ct. 713, 715, 38 L.Ed.2d 661 (1974) (per curiam); *Sanders v. Air Line Pilots Ass'n, Int'l,* 473 F.2d 244, 247 (2d Cir.1972). Taking the religious symbols clause as an example, we have grave doubts that an agency could "ascertain from the four corners of the order precisely what acts are forbidden." *Sanders v. Air Line Pilots Ass'n, Int'l, supra,* 473 F.2d at 247.

As with the potential entanglement concerns, however, we do not believe that the imprecision of some provisions of the decree renders them inherently vulnerable. If in the course of implementation some provisions are sought to be enforced, we will expect the District Court to consider carefully whether a particular provision has sufficient specificity to give fair notice of its requirements. With respect to any provision sought to be enforced in the absence of such notice, we will further expect the District Court to proceed initially by issuing an order to show cause why a defendant should not be specifically enjoined from taking or failing to take precise steps within the general contemplation of the provision alleged to have been violated. Contempt sanctions would be available only upon a defendant's failure to comply with such a particularized refinement of the decree. We adopt this two-step approach to enforcement of the decree's less precise provisions in recognition of the fact that the decree is qualitatively different from most injunctions. This decree does not enjoin anyone from continuation of prior practices found to be illegal. Instead, it is a blueprint to implement a broad change in municipal policy. The decree is of limited duration and may well be implemented without any resort to enforcement mecha-

nisms. Surely that is an objective toward which all concerned should strive.

## Conclusion

For all of the reasons set forth above, and those more fully elaborated in Judge Ward's opinion, the judgment of the District Court is affirmed.

CARDAMONE, Circuit Judge, dissenting:

The settlement reached in New York City's placement program for foster care children will inevitably result in the excessive entanglement of church and state. That conclusion is inevitable because the stipulation entered into between plaintiffs, the City, and certain private child care agencies provides for interaction in the administration of the foster care program which not only permits but actually mandates a pervasive state presence in Catholic and Jewish affiliated agencies that participate in the New York City program. This pervasive presence established by the stipulation includes extensive monitoring, enforcement provisions, record keeping and certain religious practice provisions to be applied in the sectarian agencies. Since these provisions for a state presence offend precisely those values at the core of the Establishment Clause of the First Amendment, I must respectfully dissent. In other respects, I join the majority's endorsement of the stipulation that is designed to improve New York City's delivery of foster child care services.

## I

We may not fashion or approve a remedy for alleged racial and religious discrimination that penetrates, as described by Jefferson, the "wall of separation between Church and State." *See Reynolds v. United States,* 98 U.S. (8 Otto) 145, 164, 25 L.Ed. 244 (1878). There is no doubt that "[j]udicial caveats against entanglement must recognize that the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971). Throughout the lengthy course of this litigation, the district courts also have recognized that this wall more resembles a moveable partition in a setting where the state in its role of *parens patriae* must accommodate both free exercise rights of foster children and establishment concerns of the service providers. *See Wilder v. Sugarman,* 385 F.Supp. 1013, 1026–27 (S.D.N.Y.1974) (per curiam) (*Wilder I*) ("laws which might otherwise be deemed violative of the Establishment Clause may be upheld ... [if] reasonably necessary to satisfy Free Exercise rights...."); *Wilder v. Bernstein,* 645 F.Supp. 1292, 1329–39 (S.D.N.Y.1986) (*Wilder III*) (same).

I agree with the majority that the Religious Clauses must be construed flexibly to achieve the necessary "benevolent neutrality" by government toward religion. *Walz v. Tax Comm'n,* 397 U.S. 664, 669, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). My concern is that the amount of governmental activity judicially permitted to satisfy conflicting constitutional demands has become so great as to trample the Establishment Clause's prohibitions.

The third prong of the familiar *Lemon* test prohibits "excessive government entanglement with religion." *Lemon,* 403 U.S. at 613, 91 S.Ct. at 2111 (quoting *Walz,* 397 U.S. at 674, 90 S.Ct. at 1414). No doubt exists that "[a]bsent countervailing Free Exercise interests [of children and parents] and obligations [of the state], such involvement with religious concerns and the religious aspects of sectarian institutions [as provided for in the stipulation] clearly would create an impermissible entanglement of state and church." *Wilder III,* 645 F.Supp. at 1338. The only critical Establishment Clause issue arising from the stipulation is "whether the [disputed] terms ... are reasonably necessary to protect the countervailing Free Exercise interests of children in the foster care system." *Id.*

The sectarian agencies persuasively contend that the stipulation creates an additional, impermissible layer of state involvement in private religious agency practices

as compared to the existing statutory scheme. Specifically, the New York Human Resources Administration, through its Special Services for Children Agency (SSC), will maintain detailed records as to the religious agencies' placement activity by religion (¶¶ 62–68), adopt policies to ensure the Free Exercise rights of all foster children at agencies (¶ 70), prevent agencies from displaying "excessive religious symbols" (¶ 70(9)), and grant the American Civil Liberties Union and other private plaintiffs the right to compel enforcement of the stipulation (¶ 75).

More particularly, those provisions of the stipulation that tread impermissibly on First Amendment rights are those which involve the imposition and enforcement of certain conditions designed to protect the religious practices of foster children in religious oriented institutions. A more detailed account of the specific objectionable provisions is unnecessary in light of the fact that "[a]ll parties acknowledge that the settlement contemplates additional administrative or monitoring functions to be performed by the SSC, the settlement panel and, to some extent, the Court." *Wilder III*, 645 F.Supp. at 1334.

## II

The majority justifies the additional entanglement outlined in the stipulation by distinguishing education from child care, by restricting consideration of possible Establishment Clause infirmities only to conduct that will inevitably occur, by crafting a judicial narrowing of the scope of ¶ 70(9), and by speculating that ¶ 70(9) will not actually be enforced in practice.

Concededly, the state's obligation in the child care context does distance this case to some degree from *Aguilar* and *Grand Rapids*, which tolerate virtually no entanglement in the private religious education context. *Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985); *Grand Rapids School Dist. v. Ball*, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985). But the ingenious devices drawn by the majority to revise the stipulation in the face of remaining entanglement prob-

lems instead simply reveal their excessiveness. First, if the display of religious symbols only becomes excessive when Free Exercise rights are actually violated, as the majority holds by endorsing the district court's narrowing of the religious practices and enforcement provisions (¶¶ 70(9) and 75), then the stipulation itself should reflect this construction. No matter how ¶ 70(9) is narrowed, the determination of whether particular religious symbols violate a child's Free Exercise right involves an unconstitutional state inquiry into religious practices. Second, rather than base approval of questionable provisions on the prediction that they will not be enforced, the stipulation should be remanded to the district court to excise those provisions.

The overburdensome entanglement is easily illustrated. The City or a plaintiff is entitled under ¶ 70(9) and ¶ 75 to protest and obtain the removal of a religious agency's use of its religious symbols. In this case, for example, a Star of David or the Cross point beyond themselves to express faith in the source of that which is of ultimate concern. The stipulation's grant of state power to order the sectarian agencies to remove fundamental expressions of their faith totally obliterates the barrier that must be maintained between church and state.

The stipulation reflects an unbalanced preoccupation with Free Exercise rights, which leads to impermissible entanglement under the Establishment Clause. The proposed state involvement in the religious affairs of foster children comes dangerously close to the "custom-tailoring" of each child's religious training and observance that the district court initially recognized would involve "hopelessly" excessive entanglement. *Wilder I*, 385 F.Supp. at 1029.

There is, of course, the danger of creating a "Catch–22" paradox "whereby aid must be supervised to ensure no entanglement but the supervision itself is held to cause an entanglement." *Aguilar*, 105 S.Ct. at 3243 (Rehnquist, J., dissenting); *see Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 2491, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting); *Wilder III*, 645

F.Supp. at 1334 n. 32. Here, the potential trap is that any mechanisms created to guard Free Exercise rights might inevitably entail excessive entanglement. In private religious education cases, like *Aguilar* and *Grand Rapids,* the problem can be avoided by eliminating the aid and the entanglements. In the foster child care context, the social services provided are required by the state constitution and state law and the solution is inevitably more delicate.

### III

Of course, as the majority notes, the sectarian agencies receive public funding for the services they provide to foster care children. But the religious cost for this funding, as contemplated in the stipulation, is that these religiously affiliated agencies are compelled against their will to put themselves into the hands of the plaintiffs who may—with the power of state exercised by means of a court order—force them to stop displaying the symbols of their faith. The majority rationalizes this unconstitutional provision by saying that it is not certain that plaintiffs will ever exercise such right. It then observes that the provision in the stipulation itself is a "symbol" reminding the sectarian agencies of the price they pay upon acceptance of public funds. It is ironic that the majority characterizes the restriction on displays of religious symbols itself as a "symbol" or reminder that acceptance of public funds carries with it the obligation of religious neutrality. The attempt to transform an operative term of the settlement—¶ 70(9)—into a symbolic reminder reveals both the unenforceability of ¶ 70(9) and the dangers inherent in its attempted enforcement. The provision is unenforceable because monitoring a religious symbol's effect on a child's beliefs is an impossible task. The attempt to enforce this provision necessarily requires the state to engage in this impossible task, which is precisely the type of involvement in religious affairs that the state ought to and—even in the foster care context—can avoid. Granting the state an invasive power to order the removal of what the panel deems "excessive" religious symbols unconstitutionally entangles the state in matters of religion. The sectarian agencies could well decline to provide their essential services when the conditions attached to participation in the program trench on deeply held religious convictions.

It strikes me that the district court and the parties—who have already successfully overcome many constitutional difficulties in New York's foster care system—could recraft better than this Court relevant portions of the stipulation in order to excise unwarranted and impermissible entanglements. The excessive degree of government entanglement in religious matters included in the stipulation is not reasonably necessary to ensure the Free Exercise rights of foster children. Thus, under the third prong of *Lemon,* the stipulation is constitutionally infirm.

For the reasons stated above, I dissent and vote to remand this case to the district court for it to eliminate these constitutionally objectionable features from the otherwise well-designed stipulation.