**Barbara WHALEN, Plaintiff,**

**v.**

**Robert B. ALLERS, William Happel and Pius XII Youth and Family Services, Inc., Defendants.**

**No. 02 CIV. 6569(CLB).**

United States District Court, S.D. New York.

Dec. 24, 2003.

Russell A. Schindler, Kingston, NY, for Plaintiff.

Jonathan R. Harwood, Traub Eglin Lieberman Straus, Mid–Westchester Executive Park, Hawthorne, NY, for Defendants.

### Memorandum and Order

BRIEANT, District Judge.

This case is a paradigm of the current litigation explosion; Plaintiff seeks to mulct a Catholic charity and others, for Fifteen Million Dollars in compensatory and punitive damages plus counsel fees for proselytizing her minor daughter in behalf of a Pentecostal Church. As may be imagined, Defendants seek summary judgment by a Motion filed October 10, 2003, heard and fully submitted on December 12, 2003.

The Complaint filed August 16, 2002 alleges a claim under 42 U.S.C. § 1983 for a Violation of Plaintiff's Rights under the First Amendment of the United States Constitution to raise her minor daughter in the religion of Plaintiff's choice. The Complaint also asserts a violation of New York Social Services Law § 373, discussed below.

## Facts

The following facts are undisputed. Plaintiff Barbara Whalen (Mrs. Whalen) is a resident of Dutchess County, New York who has full custody of her children as a result of a divorce from their father. Her daughter Chelsea Whalen (Chelsea) was born March 23, 1987.

Defendant Robert B. Allers, at relevant times, was Commissioner of the Dutchess County Department of Social Services of the State of New York and Defendant William Happel was a County employee in that Department. Defendant Pius XII Youth and Family Services, Inc. (Pius XII) is a charitable corporation associated with the Archdiocese of New York of the Roman Catholic Church which renders social services to persons on a non-sectarian basis. Plaintiff is of the Jewish faith and decided to exercise her Constitutional right to raise her children in the Jewish religion.

Many hospitals, schools, orphanages, nursing homes and even universities and law schools are affiliated with and under the general supervision of religious groups but seek to serve people without regard to their religion, as part of the great Judeo–Christian tradition of alms giving. Conversions are not part of the mission of such organizations.

On April 10, 2001, when Chelsea was fourteen, her mother filed a Petition in New York State Family Court, County of Dutchess, alleging that Chelsea was a Person In Need of Supervision (PINS). See § 732 of the New York Family Court Act. The Family Court of Dutchess County ordered Chelsea to be placed in the temporary custody of Defendant Allers in his capacity as the County Commissioner of Social Services, pending resolution of the PINS Petition. Defendant William Happel, in his capacity as an employee of the Dutchess County Department of Social Services, placed Chelsea at a residential facility maintained by Pius XII in Poughkeepsie, New York for the care and housing of PINS and other juveniles placed by the Family Court.

The record is devoid of any evidence that Mrs. Whalen informed any of the Defendants concerning Chelsea's religion, and when Chelsea entered Pius XII, she filled out an intake form and next to the space for "Religion" wrote "None". There is no evidence that Defendants knew that Mrs. Whalen was Jewish or that she desired her children to be raised in the Jewish faith.

Michael D. Bennett, whose deposition has been submitted, was a Youth Counselor at the Pius XII facility at 39 Lent Street, Poughkeepsie. This residence ordinarily had about eight youths most of whom were PINS. The facility had a Recreation Program; a youth who was free of restrictions and in good standing could go out on a trip in the custody of a Youth Counselor, using a van belonging to the facility. These recreation trips included rolling skating, ice skating, movies, bowling, parks and visits to such places as the Roosevelt Mansion and the Vanderbilt Estate. Mr. Bennett sometimes also took the children to his church. He was a member of the "Penuel Pentecostal Tabernacle" located across the river in Newburgh, New York. Recreational trips were posted, and children signed up in advance to go. The trips were planned by the persons in charge at the facility, except for Mr. Bennett's trips to church. Mr. Bennett volunteered to take the children to church because he was going in any event and those who were free of restriction were "just, you know, allowed to go". No process was employed by him to determine the religious affiliation of the children going with him to church (Bennett Deposition at p. 10). The Penuel Church had a band play-

ing modern music as part of its services, and dancing was included.

Bennett testified (p. 14):

Q. Tell me what you remember about that rec trip and her getting baptized?

A. Okay. Well, we went to church and after church my Pastor asked is there anyone here that needs to be baptized and [Chelsea] indicated to him that she wanted to be baptized.

Thereafter, on the following Sunday, Chelsea was baptized in the Penuel Pentecostal Church and returned to Pius XII. A case worker made an entry in a log under date of May 20, 2001 "Good Luck & Prayers to C. Whalen, who is getting baptized today".

· The Deposition of Chelsea Whalen was taken July 28, 2003 when she was sixteen years old. Her testimony reflects an intelligent and articulate youth. She testified that she had visited her maternal grandparents four times a year for religious holidays and on the occasion attended Temple with her grandparents, her mother and brother and, sometimes, her father. She also attended Jewish religious services while residing with her mother and had also attended Hebrew School when she was in First Grade, and a religious Kindergarten. She testified (p. 31):

Q. And why did you attend Temple during that period of time?

A. Because I had to.

Q. And when you say you had to, what does that mean?

A. I wasn't old enough to make my own decision and she made me go, my mom made me go.

Her mother had suggested that she be bas mitzvahed, but she was not, and testified that "I didn't want to" (p. 37).[1]

Chelsea testified that three or four residents of Pius XII went on the rec. trips to the Pentecostal Church with Mr. Bennett and that she attended four or five times (p. 87). Services generally lasted an hour or an hour and one-half. She testified (p.89):

Q. What was the reason you wanted to go to the service the first time they announced it?

A. I wanted to learn about it.

Q. Did you have any understanding as to whether the fellow driving the van was a member of that church?

A. Yes, he was, that's why we went, because he was a member and he went every Sunday. And he asked anybody in the house if they wanted to go, it wasn't exclusive to that one religion in the house.

Q. Do you know if during the first week he went to church, did you have any questions about religion?

A. I did.

Q. And to whom did you address those questions?

A. People in the church. Mainly, the pastor, Pastor—I don't recall the names.

Q. Who introduced you to the pastor?

A. This guy [Mr. Bennett].

She was then fourteen, and testified (p. 110):

Q. Did there come a point where you told the fellow who drove the van back and forth to the church that you were thinking of Baptism?

A. I told him and said that—I told him what the Pastor had said about coming next week and he said that's fine, if that's what I wanted to do, then I can, that's fine.

Q. Were any conversations between you and the driver any more in depth

---

1. Chelsea had also rejected Catholicism, the religion of her father. See Deposition at 59.

than you just indicated with respect to the implications of becoming affiliated with a religion?

A. He just asked my why I wanted to.

Q. And what was the sum and substance of that conversation?

A. Told him why I wanted to, everything I said before, what I felt.

Q. Were those conversations he initiated about your religious issues or were those conversations you initiated?

A. I initiated them.

Q. Now, you indicated the Pastor had some assistant type folks. Did you ever speak with those people?

A. They just told me what to do when I got baptized.

Q. From the time that you told the Pastor you were considering baptism until the time you were actually baptized, who, if anyone, other than the Pastor did you discuss this decision with?

A. Just the staff member, that's it.

Chelsea testified that she assumed that Pius XII was a Roman Catholic institution. Mr. Bennett testified (p. 15) that the Penuel Pentecostal Tabernacle is a part of United Pentecostal Church International (UPCI) which he described as one of the many organizations in the Pentecostal movement. The feast of Pentecost is on the seventh Sunday after Easter in the Christian calendar, also known as Whitsunday. The celebration of Shavuot is also on occasion referred to as Pentecost. According to Chapter 2 of the Book of Acts, the Apostles were gathered together on the day of Pentecost when the Holy Spirit came upon them and they began to speak with other tongues and listeners of different languages each heard them in his own tongue. This "speaking in tongues" was taken as a sign that the disciples should spread their faith throughout the world.[2]

Many unrelated Christian organizations call themselves Pentecostal. United Pentecostal Church International, to which the Penuel Church belongs, has a world-wide constituency, according to its website, of more than four million people and 28,-351 churches and meeting places. The UPCI is said by its website to have begun in Topeka, Kansas in 1901 by a group which withdrew from the Assemblies of God over a doctrinal dispute. Local churches select their own clergy, own their own property and establish their own criteria for membership. The UPCI claims to hold a fundamental view of the Bible, that the Bible is the Word of God and therefore inerrant and infallible. The UPCI churches reject all extra-Biblical revelations and writings. It has no bishops and no creeds. Its view of the Doctrine of the Holy Trinity is significantly different from that taught by the Roman Catholic Church. Pentecostals hold that salvation is by grace through faith. Its members do not recognize the Pope, reject the Primacy of Peter, and are unconcerned with Apostolic Succession. Pentecostal doctrine, organization and form of worship differ greatly from that of the Roman Catholic Church. It flies in the face of common sense to suggest that a Roman Catholic charity would have any purpose or motivation to cause a child to join a Pentecostal Church.

2. Others mocking said, these men are full of new wine.
But Peter, standing up with the eleven, lifted up his voice and said unto them, ye men of Judea and all ye that dwell at Jerusalem, be this known to you and hearken to my words:

For these are not drunken, as ye suppose, seeing it is but the third hour of the day,
But this is that which was spoken by the prophet Joel;
2 Acts 13–16 (King James Version)

*Defendants Allers and Happel*

■ We consider first the claim against Commissioner Allers and his deputy, William Happel. While the Court sympathizes with the concern of any parent whose child, for whatever reason abandons the religion of his or her forebears, that is not the issue in the case. The issue is rather whether there is any evidence to support a finding that any Defendant violated the rights of the Plaintiff. The right at issue is a valuable Constitutional right, directly involving the protected interests of parents in nurture, care and custody of children, which has long been acknowledged to extend to determining the religious upbringing of their children. *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

There is no liability imposed upon a public official who had no personal involvement in the alleged Constitutional violation. *Al—Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1066 (2d Cir.1989). That Commissioner Allers held a position of authority with respect to Chelsea's placement does not satisfy the requirement for personal involvement in the Constitutional tort before he may be held liable. He did not participate in the events complained of and did not learn of the alleged violation until long afterward. There is no evidence that the violation occurred as a result of any practice or policy of the Dutchess County Department of Social Services or Commissioner Allers.

The same analysis applies to Defendant William Happel. He and the Commissioner made a placement with Pius XI pursuant to a valid Court Order of the New York Family Court. Neither he nor Commissioner Allers had any actual or constructive knowledge that Chelsea was Jewish, or that Plaintiff wanted to have her

participation in the religious faith designated by the family assured during her temporary placement. Chelsea, on entering Pius XII, stated she had no religion, and neither Happel nor Allers had any information to the contrary.[3] Neither Happel nor Allers had any reasons to expect that, while placed at Pius XII, Chelsea would voluntarily attend Pentecostal services and request Baptism. Happel had no personal participation in the Constitutional tort. Subsequent to finding out about the occurrence, the Department issued a directive that youths in non-secure detention facilities are not allowed to attend religious services without the express written consent of their parents.

■ We now consider the New York statutory claim. That claim, asserted under § 373 of the New York Social Services Law, can be alleged only against Defendants Allers and Happel, because by its terms the statute affects only the courts and state officials charged with effecting placements. It does not apply, therefore, to Pius XII which is only an authorized agency to *receive* commitments of children. The statute reads in relevant part as follows:

§ 373. **Religious faith**

1. Whenever a child is committed to any agency, association, corporation, institution or society, other than an institution supported and controlled by the state or a subdivision thereof, such commitment shall be made, when practicable, to an authorized agency under the control of persons of the same religious faith as that of the child.

\*    \*    \*    \*    \*    \*

4. The provisions of subdivision one, two and three of this section shall be so interpreted as to assure that in the care,

---

3. The family name of Whalen bespeaks Celtic origin.

protection, adoption, guardianship, discipline and control of any child, its religious faith shall be preserved and protected.

\* \* \* \* \* \*

6. The provisions of this section in relation to the protection of the religious faith of children shall also apply to minors between sixteen and eighteen years of age.

7. The provisions of subdivisions one, two, three, four, five and six of this section shall, so far as consistent with the best interests of the child, and where practicable, be applied so as to give effect to the religious wishes of the natural mother, and of the natural father whose consent would be required for the child's adoption pursuant to section one hundred eleven of the domestic relations law, if the child is born out-of-wedlock, or if born in wedlock, the religious wishes of the parents of the child, or if only one of the parents of an in-wedlock child is then living, the religious wishes of the parent then living. Religious wishes of a parent shall includes wishes that the child be placed in the same religion as the parent or in a different religion from the parent or with indifference to religion or with religion a subordinate consideration. Expressed religious wishes of a parent shall mean those which have been set forth in a writing signed by the parent, except that, in a non-agency adoption, such writing shall be an affidavit of the parent. In the absence of expressed religious wishes, as defined in this subdivision, determination of the religious wishes, if any, of the parent, shall be made upon the other facts of the particular case, and, if there is no evidence to the contrary, it shall be presumed that the parent wishes the child to be reared in the religion of the parent.

The litigation history of § 373 has concerned mostly applications in the nature of injunctive relief to change the placement of a child to conform to the wishes of the parent. Actions in which monetary damages have been awarded are few or nonexistent. This is in large part because the requirements are framed as "when practicable" in paragraphs 1, and again in 7, and the express wishes of the parent must be contained in "a writing signed by the parent". This case has no such writing. No alternative placement was available in Dutchess County, and Chelsea's placement was regarded as temporary.

The plain meaning of the statute does not reach the factual situation in this case. In any event, the statute was construed and substantially eviscerated by our Court of Appeals in *Wilder v. Bernstein,* 848 F.2d 1338, 1341-2 (2d Cir.1988) as a result of a Constitutional attack on establishment grounds.

The Court of Appeals held:

The religious matching aspect of New York's child care scheme is set forth in state constitutional and statutory provisions. The State Constitution provides that a child shall be placed "when practicable, in an institution or agency governed by persons, or in the custody of a person, of the same religious persuasion as the child." N.Y. Const. art. 6, § 32. The primary implementing statute provides that a commitment shall be made "when practicable, to an authorized agency under the control of persons of the same religious faith as that of the child." N.Y. Soc. Serv. Law § 373(1). The statute further provides that it shall be applied "so far as consistent with the best interests of the child" and "where practicable ... so as to give effect to the religious wishes" of the parents. *Id.* § 373(7). In the absence of the parents' expressed wishes, "it shall be presumed

that the parent wishes the child to be reared in the religion of the parent." *Id.*

These religious matching provisions were authoritatively construed by the New York Court of Appeals in 1972. *In re Dickens v. Ernesto,* 30 N.Y.2d 61, 330 N.Y.S.2d 346, 281 N.E.2d 153, *appeal dismissed for want of substantial federal question,* 407 U.S. 917, 92 S.Ct. 2463, 32 L.Ed.2d 803 (1972). Considering the provisions in the context of an adoption, the Court said that the statutes "place[ ] primary emphasis on the temporal best interests of the child, although the religious preference of the natural parents remains a relevant consideration." *Id.* at 66, 330 N.Y.S.2d at 348, 281 N.E.2d at 155.

*Id.* at 65–66, 330 N.Y.S.2d at 348, 281 N.E.2d at 155.

\* \* \* \* \* \*

*Wilder* also held (p. 1346–47):

It is one thing to recognize the right of parents to choose a religious school for their children as a private alternative to meeting state-imposed educational requirements in public schools. It is quite another matter, however, to suggest that parents who are unable to fulfill their parental obligations, thereby obliging the state to act in their stead, at their request or involuntarily, nonetheless retain a constitutional right to insist that their children receive state-sponsored parenting under the religious auspices preferred by the parents. So long as the state makes reasonable efforts to assure that the religious needs of the children are met during the interval in which the state assumes parental responsibilities, the free exercise rights of the parents and their children are adequately observed.

We agree with the appellants that the first-come, first-served principle is likely to reduce the frequency of in-religion placements, especially with respect to Catholic and Jewish agencies, because preferred agencies will sometimes have no vacancies. This prospect, though doubtless contrary to the preferences of many Catholic and Jewish parents whose children will require placement, is not a denial of their free exercise rights.

Nothing in § 373 as construed in *Wilder* adds anything to Plaintiff's claim in this lawsuit. Defendants Allers and Happel are entitled to Summary Judgment in their favor.

*Defendant Pius XII*

■ We now turn to the case against Pius XII. The Court agrees with Plaintiff that Pius XII is a "state actor" within Section 1983. *Perez v. Sugarman,* 499 F.2d 761 (2d Cir.1974). There is no evidence presented that Pius XII had any policy or practice which resulted in the Constitutional tort complained of. Indeed, as noted earlier, it is implausible, and indeed ludicrous that Pius XII would engage in supporting or advancing the desire of a child committed to its care to be baptized among the Pentecostals contrary to her parent's wishes. And it did not. As noted earlier, Pius XI had no actual or constructive notice that Chelsea was Jewish or that her mother had decided to raise her in the Jewish faith. Liability under the civil rights laws may not be founded on negligence, but there is not even any negligence in this case, because none of the participants knew of the underlying facts which would have triggered any duty of care.

■ To the extent the actions of Bennett may have infringed on Plaintiff's rights, he was acting on his own in what the early caselaw describes as a "frolic and detour". There is no liability for the acts of an agent or employer in the context of this case. *Respondent superior* is not ap-

plicable in the context of a Section 1983 claim. *Monell v. City of New York Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Correctional Services Corp. v. Malesko,* 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) (no *Bivens* claim lies against corporate employer). See also *Temple v. S.O. Albert,* 719 F.Supp. 265, 268 (S.D.N.Y. 1989) (Conner, J.), holding:

> neither the Supreme Court nor the Second Circuit appear to have addressed directly the issue of whether a private corporate employer may be held liable under § 1983 on a *respondeat superior* theory. However, numerous courts in other jurisdictions have held that a corporate employer is not vicariously liable, relying on the reasoning of *Monell.* See, e.g., *Iskander v. Village of Forest Park,* 690 F.2d 126, 128–29 (7th Cir. 1982); *Powell v. Shopco Laurel Co.,* 678 F.2d 504, 506 (4th Cir.1982); *Draeger v. Grand Central, Inc.,* 504 F.2d 142, 145–46 (10 Cir.1974); *Estate of Iodice v. Gimbels, Inc.,* 416 F.Supp. 1054, 1055 (E.D.N.Y.1976). I agree that there is no tenable reasons to distinguish a private employer from a municipality. Thus, a private corporate employer may not be vicariously liable under § 1983.

Accordingly, Pius XII is also entitled to summary judgment in its favor.

### Chelsea's Free Will

Although it was not briefed by the parties, a significant issue involving Chelsea's free will and freedom of conscience, also protected by the First Amendment, stands out in the case. Many privileges are granted to minors by statute or common law. A child of seventeen is eligible as a blood donor, marriage emancipates a child, a minor can engage in business, petition a court to appoint a General Guardian or a Guardian *ad litem,* join in an adoption petition or a change of name petition, engage in executory contracts which are not void, but merely voidable at his election to disaffirm, and become liable for his negligence.

There is ample judicial authority for the proposition that the religious opinion or decisions of a mature child conflicting with those of the parent are entitled to First Amendment protection. *Wisconsin v. Yoder,* 406 U.S. 205, 242–43, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972, Douglas, J. dissenting). As Justice Douglas expressed it (*Id.* at 243, 92 S.Ct. 1526):

> Our opinions are full of talk about the power of the parents over the child's education. See *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070; *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042. And we have in the past analyzed similar conflicts between parent and State with little regard for the views of the child. See *Prince v. Massachusetts,* [321 U.S. 158, 64 S.Ct. 438]. Recent cases, however, have clearly held that the children themselves have constitutionally protectable interests.

> These children are "persons" within the meaning of the Bill of Rights. We have so held over and over again. In *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224, we extended the protection of the Fourteenth Amendment in a state trial of a 15–year–old boy. *In re Gault,* 387 U.S. 1, 13, 87 S.Ct. 1428, 18 L.Ed.2d 527, we held that "neither the Fourteenth Amendment nor the Bill of Rights is for adults alone." In *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, we held that a 12–year–old boy, when charged with an act which would be a crime if committed by an adult, was entitled to procedural safeguards contained in the Sixth Amendment.

In *Tinker v. Des Moines School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, we dealt with 13–year–old, 15–year–old, and 16–year–old students who wore armbands to public schools and were disciplined for doing so. We gave them relief, saying that their First Amendment rights had been abridged.

> "Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State." *Id.*, at 511, 89 S.Ct. 733.

In *Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, we held that schoolchildren, whose religious beliefs collided with a school rule requiring them to salute the flag, could not be required to do so. While the sanction included expulsion of the students and prosecution of the parents, *id.*, at 630, 63 S.Ct. 1178, the vice of the regime was its interference with the child's free exercise of religion. We said: "Here ... we are dealing with a compulsion of students to declare a belief." *Id.* at 631, 63 S.Ct. 1178. In emphasizing the important and delicate task of boards of education we said:

> "That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind as its source and teach youth to discount important principles of our government as mere platitudes." *Id.*, at 637, 63 S.Ct. 1178.

Courts have regularly upheld the right of a mature minor not emancipated; to pursue his or her own choice of religion regardless of parental attempts to exercise their Constitutional right to raise their children in their own faith. See generally 82 Mich. L.Rev. 1702 (1984). Note: *The Establishment Clause and Religion in Child Custody Disputes* and cases cited therein at n. 88–94; *Martin v. Martin*, 283 A.D. 721, 127 N.Y.S.2d 851 (2d Dept.1954) affd. 308 N.Y. 136, 123 N.E.2d 812 (1954) (affirming order modifying a judgment which enforced a pre-nuptial agreement that child be brought up in an identified denomination, so as to provide that a twelve year old child might attend the church of his own choice); *Hehman v. Hehman*, 13 Misc.2d.318, 178 N.Y.S.2d 328 (1958); *In re Lori M.*, 130 Misc.2d 493, 496 N.Y.S.2d 940 (N.Y.Fam.Ct.1985) (mature child age fifteen had the Constitutionally protected right of privacy to decide her sexual orientation as a lesbian).

As pointed out in *Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 74, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976):

> Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess Constitutional rights.

At the age of fourteen, this mature child, Chelsea, had the right protected by the First Amendment to make her own religious commitment, without regard to her mother's wishes, and she did so. To the extent any defendant facilitated her voluntary choice, no basis exists in law to impose liability.

### Conclusion

The motion is granted and the action is dismissed. The Clerk shall file a final judgment.

SO ORDERED.