Nina **BEKTIC–MARRERO**, as Administrator of the Estate of Jose Marrero, on her own behalf, and as a Parent and natural guardian of her infant child, S.M., Plaintiffs,

v.

Randy **GOLDBERG**, M.D., Westchester County Health Care Corporation, Westchester Medical Center, New York Medical College, Andrew Spano, Joseph Spano, Anthony Amicucci, Gail Bailey–Wallace, M.D., and June Yozzo, R.N., Defendants.

No. 11 Civ. 1781(CM).

United States District Court, S.D. New York.

March 7, 2012.

420

Michael Anthony Deem, Michael A. Deem, P.L.L.C., Ossining, NY, for Plaintiff.

William Harold Bave, Wilson, Bave, Conboy, Cozza & Cozza, P.C., Jane Hogan Felix, White Plains, NY, Margaret O'Connor, Kaufman Borgeest & Ryan LLP, Dennis John Dozis, Kaufman, Borgeest & Ryan, LLP, Valhalla, NY, for Defendants.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS, AND DENYING PLAINTIFF'S MOTION FOR LIMITED DISCOVERY

McMAHON, District Judge.

Before the Court is a series of four motions—one from plaintiff, and one each from three groups of moving defendants—each addressed to a unique constellation of state and federal claims. In the end, resolving these motions does little to advance the litigation in a meaningful way.

The motions are denied, except that the *Monell* claim against Defendant New York Medical College is granted.

### BACKGROUND

*A. The parties*

Plaintiff Nina Bektic–Marrero ("Plaintiff") brings this suit on behalf of her deceased husband, Jose Marrero ("Marrero"), acting in her role as administrator of his estate. (*See* Felix Decl., Ex. A, ¶¶ 1, 6.) She also brings claims on her own and her son's behalf, as well as claims derivative of Marrero's. The suit arises out of Marrero's medical treatment while he was in the custody of the Westchester County Department of Correction (the "Westchester DOC").[1]

According to the Complaint, Defendant Westchester County (the "County") is responsible for the administration of the Westchester DOC. (*Id.* ¶ 9.) The County entered into written contracts with Defendants Westchester County Health Care Corporation (the "WCHCC"), Westchester

---

1. Although its name suggests a municipal government agency, the "Westchester Department of Correction" is, in fact, a physical detention center, with a "Jail Division," a "Penitentiary Division," and a "Women's Unit." (*See* Westchester Department of Correction: About Us (available at http://correction.westchestergov.com/about-us); *see also* Felix Decl., Ex. A, Attachment (CRIPA Investigation of the Westchester County Jail, Valhalla, New York) ("Report"), at 2.)

Medical Center (the "WMC"), and New York Medical College ("NYMC"), to provide medical care and treatment to Westchester DOC inmates. (*Id.* ¶ 24.) The WCHCC is a public benefit corporation organized under New York law (*id.* ¶ 10), and the WMC is a medical services corporation organized under New York law. (*Id.* ¶ 11.) NYMC is a private medical school organized under New York law as a not-for-profit corporation. (*Id.* ¶ 12.) The Westchester DOC, the WMC, and NYMC all share the same campus in Valhalla, New York.

Defendants Gail Bailey–Wallace, M.D., Randy Goldberg, M.D., and June Yozzo, R.N., are among the individuals who administered the challenged medical care to Marrero during the term of his incarceration. Dr. Bailey–Wallace is alleged to be the "acting Medical Director for Chronic Care Services at Correctional Health Services, a division of [NYMC], at the [Westchester] DOC." (*Id.* ¶ 16.) Dr. Goldberg is the "acting Assistant Medical Director for Chronic Care Services at Correctional Health Services, a division of [NYMC], at the [Westchester] DOC." (*Id.* ¶ 17.) Yozzo, a licensed nurse, is alleged to be the "Health Care Coordinator" for the Westchester DOC. (*Id.* ¶ 18.)

Finally, Defendant Andrew Spano was, at the times relevant to the Complaint, Westchester County Executive (*id.* ¶ 13); Joseph Spano was the Commissioner of the Westchester DOC (*id.* ¶ 14); and Anthony Amicucci was the "Warden" of the Westchester DOC. (*Id.* ¶ 15.)

*B. Marrero's medical treatment at the Westchester DOC*

On June 10, 2009, Marrero was committed to the custody of the Westchester DOC on a parole violation. During the intake process, he informed the Westchester DOC that he was a long-time and current smoker, and that both his mother and sister suffered laryngeal cancer. (*Id.* ¶¶ 34–35.) In October 2009, Marrero informed Dr. Goldberg personally that his mother and sister suffered from esophageal cancer. (*Id.* ¶ 39.)

In September and October 2009, Marrero submitted several "sick call slips," complaining that he felt a foreign object in his throat, which interfered with his ability to speak or swallow. However, on each visit to the infirmary, the medical staff only lightly touched the outside of his throat and assured him that the sensation would go away on its own. No oral examination was performed, and no antibiotics or diagnostic tests were prescribed. (*Id.* ¶¶ 36–38.)

In October 2009, Marrero's condition has worsened to the point where he could no longer swallow solid food, had great difficulty swallowing water, and could barely speak. Even so, no oral exam or diagnostic test was prescribed. Rather, unidentified medical staff simply pureed his food, and crushed his diabetes and hypertension pills and mixed them with water. (*Id.* ¶¶ 40–42.)

Between October and November 2009, prison staff neglected to puree Marrero's food for him. As a result, he could not eat at all, and he lost thirty pounds over six weeks. The signs of Marrero's illness were so obvious that several correction officers and civilian employees ordered the ailing Marrero to report to the infirmary. Marrero was switched to a liquid diet in November 2009, but even still, no oral exam was conducted, and no diagnostic test or antibiotic medication was prescribed. (*Id.* ¶¶ 43–45.)

Finally, after numerous telephone calls to Dr. Bailey–Wallace, Dr. Goldberg, and Yozzo, Marrero was given a barium swallow test—the first diagnostic test ordered

after nearly three months of apparent distress and severe weight loss. After Dr. Goldberg reviewed the result, he told Marrero that "it may be cancer," and ordered blood tests. Although the blood tests quickly revealed that Marrero had cancer, Dr. Goldberg did not inform Marrero of this finding, Marrero was not referred to an oncologist at this time. (*Id.* ¶¶ 46–51.)

Approximately four weeks later, in early December 2009, Marrero was scheduled for a computed tomography ("CT") scan. The scan revealed a cancerous mass in Marrero's throat. Marrero was not immediately informed of these results or referred to an oncologist. (*Id.* ¶¶ 53–54.)

On December 12, 2009, Marrero came to the Westchester DOC infirmary, complaining that he could no longer swallow even water. At this point, Plaintiff alleges, the results of the blood test and CT scan— both of which indicated a cancerous growth in Marrero's throat—were known. Nevertheless, Westchester DOC "medical personnel" told Marrero that his throat condition would "go away" on its own. A few hours later, Marrero collapsed as a result of dehydration and malnutrition. (*Id.* ¶¶ 55–56.)

Marrero was then admitted to the "I Block," described in the Complaint as a medical wing of the Westchester DOC. Only then was he informed that he had cancer. Dr. Goldberg told Marrero that the blood tests, the results of which had been known for weeks, revealed the cancer; he also told Marrero that he had about six months to live. (*Id.* ¶¶ 56–58.)

When she heard the news, Plaintiff (Marrero's wife) asked Yozzo, and other Westchester DOC personnel, for copies of Marrero's medical records. She hoped to use these to have Marrero's parole restored and to seek a second medical opinion. However, Yozzo denied or delayed responding to these requests. Plaintiff also asked Yozzo to provide Marrero with Ensure (a liquid dietary supplement), and offered to supply it to Westchester DOC herself, if necessary. Yozzo expressly denied this request as well. (*Id.* ¶¶ 59–61.)

In mid-December 2009, a biopsy confirmed that the growth in Marrero's throat was a Stage IV carcinoma; the same day, (unidentified) doctors discovered a second mass on Marrero's liver. Plaintiff was only informed of her husband's biopsy results weeks later, by Dr. Bailey–Wallace. (*Id.* ¶¶ 62–65.)

Marrero received some of his intensive medical care, including his biopsy, at the WMC. Plaintiff alleges that, the day before each of Marrero's visits to the WMC, Marrero was transferred to the Westchester DOC's I Block and given intravenous fluids. Plaintiff alleges "on belief" that that "the sole purpose and intent of [the] IVs was to obfuscate the true nature of Mr. Marrero's physical condition and conditions of confinement," (*id.* ¶ 66–67), i.e., his weight loss and malnutrition.

In late December 2009, or early January 2010, Marrero was transferred from the Westchester DOC to a secure wing of the WMC. Immediately upon his arrival, doctors inserted a feeding tube into Marrero's stomach, through which he was fed Ensure. (*Id.* ¶¶ 69–70.) In January 2010, Marrero was scheduled for and received chemotherapy at the WMC. His parole was restored on January 29, 2010, and he continued to receive chemotherapy at the WMC in February 2010. (*Id.* ¶¶ 74–75.)

From March through May 2010, Marrero continued to receive treatment at other private facilities; however, his physicians informed him that because the treatment began only after the cancer progressed to Stage IV, little could be done. (*Id.* ¶¶ 76–78.) Marrero died of cancer-related causes on September 23, 2010. (*Id.* ¶ 80.)

### C. Litigation history

Plaintiff alleges that, within ninety days of the events giving rise to Marrero's underlying tort claims, a written Notice of Claim was served on the County, the WCHCC, and the WMC (*id.* ¶ 19); and that, within ninety days of Marrero's death, another written Notice of Claim was served on the same Defendants. (*Id.* ¶ 20.) There is no dispute—at this stage, at least—that Plaintiff's claims were timely commenced, and consistent with New York's notice of claim statutes.

On February 15, 2011, Plaintiff obtained letters of limited administration, granting her authority to file and prosecute the claims that accrued to Marrero before his death. (*Id.* ¶ 6); *see also* N.Y. Estates, Powers and Trusts Law § 11–3.2(b) ("No cause of action for injury to person or property is lost because of the death of the person in whose favor the cause of action existed. For any injury an action may be brought or continued by the personal representative of the decedent . . .").

On March 15, 2011, Plaintiff commenced this suit. (ECF No. 1.) After reciting the foregoing facts, her Complaint sets forth the following causes of action:

*Against Dr. Bailey–Wallace, Dr. Goldberg, and Yozzo:* (1) § 1983 claims on the theory that they acted with deliberate indifference to Marrero's serious medical needs, and (2) pendent state law claims for "gross negligence," wrongful death, intentional and negligent infliction of emotional distress, and prima facie tort, (Felix Decl., Ex. A, ¶¶ 91–94 (§ 1983); *id.* ¶¶ 100–03 (negligence); *id.* ¶¶ 113–16 (wrongful death); *id.* ¶¶ 100–

03 (emotional distress); *id.* ¶¶ 108–10 (prima facie tort));

*Against the County, the WCHCC, the WMC, and NYMC:* (1) § 1983 claims, under a *Monell* theory, and (2) pendent state law claims for medical malpractice (on Marrero's behalf) and wrongful death (on Plaintiffs behalf), both directly, and as the employers of Dr. Bailey–Wallace, Dr. Goldberg, and Yozzo, on the theory of respondeat superior, (*id.* ¶¶ 85–90 (*Monell*); *id.* ¶¶ 104–07 (malpractice); *id.* ¶¶ 113–16 (wrongful death); *id.* ¶¶ 111–12 (respondeat superior));

*Against Spano, Spano, and Amicucci:* (1) pendent state law claims for "negligent supervision, training, discipline and retention." (*Id.* ¶¶ 95–99.)

Finally, Plaintiff alleges a derivative claim for loss of consortium against all Defendants. (*Id.* ¶¶ 117–18.)

On April 6, 2011, NYMC moved, by itself, to dismiss all the claims against it, (ECF No. 18.) A week later, the County, Spano, Spano, Amicucci and Yozzo, moved together to dismiss the federal claims against them, and signaled their intent to move for summary judgment on the basis of qualified immunity should their motion to dismiss be denied. (ECF No. 29.) Finally, on April 28, 2011, Drs. Bailey–Wallace and Goldberg moved to dismiss the § 1983 claims against them, and, in the alternative, for summary judgment based on qualified immunity. (ECF No. 48.)[2]

Plaintiff opposes all three motions. However, because Drs. Bailey–Wallace and Goldberg did not comply with my Individual Rules for the filing of motions for summary judgment premised on qualified

---

**2.** However, before a reply brief could be filed in this last motion sequence, the County took over the representation of Drs. Bailey–Wallace and Goldberg. (ECF No. 62.) The Doctors' motion is considered fully briefed despite the absence of a Reply, and the defense counsel declined the opportunity to withdraw it. Thus, the Court will decide all three motions herein.

immunity (as discussed further below), Plaintiff did not oppose that motion with evidentiary submissions, instead relying solely on Defendants' failure to comply with my rules.

### DISCUSSION

I address the Defendants' motions in the following order: (A) Drs. Bailey–Wallace and Goldberg; (B) Nurse Yozzo; (C) Westchester County and Spano, Spano and Amicucci; and (D) NYMC.

### A. The Doctor Defendants

#### 1. Introduction

As noted, Plaintiff seeks damages against Doctors Goldberg and Bailey–Wallace (the "Doctor Defendants") invoking 42 U.S.C. § 1983 and several common law torts: "gross negligence," wrongful death, intentional and negligent infliction of emotional distress, and prima facie tort. The Doctor Defendants have moved under Federal Rule of Procedure 12(b)(6) to dismiss the § 1983 claim only.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court evaluates the sufficiency of the complaint under the "two-pronged approach" suggested by the United States Supreme Court in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). First, "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. *Iqbal,* 129 S.Ct. at 1949; *Hayden v. Paterson,* 594 F.3d 150, 161 (2d Cir.2010).

Second, "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Iqbal,* 129 S.Ct. at 1950. A claim is facially plausible "when the plain-tiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

To state a claim under § 1983 on Marrero's behalf, Plaintiff must show that Marrero was denied a constitutional or federal statutory right and that the deprivation of that right occurred under color of state law. *See* 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Section 1983 does not grant any substantive rights but rather, "provides only a procedure for redress for the deprivation of rights established elsewhere," such as in the Constitution or federal statutes. *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994).

As relevant here, Plaintiff alleges that the Doctor Defendants violated Marrero's constitutional right under the Eighth and Fourteenth Amendments to be free from cruel and unusual punishment, when they acted with deliberate indifference to Plaintiff's serious medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *see also Jones v. Westchester Cnty. Dep't of Corrections Med. Dep't,* 557 F.Supp.2d 408, 413–14 (S.D.N.Y.2008).

The Doctor Defendants move for dismissal, arguing that Plaintiff has failed to allege that their administration of medical care was "under color of State law." or that they were State actors, a prerequisite to liability under § 1983. *See Sybalski v. Indep. Grp. Home Living Program, Inc.,* 546 F.3d 255, 257 (2d Cir.2008).

The Doctor Defendants have also moved alternatively for summary judgment on the ground of qualified immunity. As noted above, Plaintiff does not oppose this motion with the necessary evidentiary material—her and her husband's testimony concerning his treatment at the hands of the Doctor Defendants—but relies solely on the Doctor Defendants' failure to adhere to the Court's rules in making this motion.

Thus, I cannot decide the summary judgment motion. It is this Court's practice to decide motions for summary judgment based on qualified immunity only after the plaintiff has been deposed. If, on the plaintiff's telling of the story—supplemented by whatever non-conflicting evidence the defendant can submit—the defendants would still be entitled to qualified immunity, then summary judgment will be granted. If, on the other hand, facts material to the application of the qualified immunity doctrine are in dispute, summary judgment is not appropriate.

I see no reason to diverge from my usual practice in this case, and thus, I will not decide that portion of the Doctor Defendants' motion that asks for summary judgment on the basis of qualified immunity. Because Plaintiff's claims survive the instant motion to dismiss, however, I provide further instruction below regarding how the individual Defendants should proceed with a motion for summary judgment based on qualified immunity, should they choose to do so—and with what kind of evidence Plaintiff should respond.

### 2. *Under color of state law*

The only the question before me now is whether Plaintiff has adequately alleged that the violation of Marrero's constitutional rights occurred under color of state law.

■ As noted, a prerequisite to recovery under § 1983 is that the alleged consti-

tutional violation be committed by one acting under color of law. *West,* 487 U.S. at 48–50, 108 S.Ct. 2250. The Supreme Court has recognized that an individual acts under color of state law when she exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Polk County v. Dodson,* 454 U.S. 312, 317–18, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (internal quotation marks and citation omitted). As a general rule, state employment is sufficient to render the defendant a "state actor," which, in turn, is sufficient for a finding of action taken "under color of state law" for purposes of § 1983. *West,* 487 U.S. at 49, 108 S.Ct. 2250,

■ However, direct employment by the State is not *necessary* to a finding of either state action or action taken under color of state law. Rather, "The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights fairly attributable to the State?" *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (internal quotation marks and citation omitted).

The Doctor Defendants argue that when they treated Plaintiff, they were not acting under color of state law because they were not employed directly by the state. However, their argument is so obviously foreclosed by the Supreme Court's decision in *West v. Atkins, supra,* that their failure to address it, let alone distinguish it, is fatal to their motion.

In *West v. Atkins,* the United States Supreme Court held that "a physician employed by [the state] to provide medical services to state prison inmates ... act[s] under color of state law for purposes of

§ 1983 when undertaking his duties in treating [a prisoner's] injury. Such conduct is fairly attributable to the State." 487 U.S. at 54, 108 S.Ct. 2250. Recognizing that states have a constitutional duty under the Eighth Amendment to provide prisoners with adequate medical care, and that prisoners typically may only seek medical help from physicians employed by the state, the Court held that such physicians are thus both "authorized and obliged," by state law, "to treat prison inmates." *Id.* at 54–55, 108 S.Ct. 2250. The Supreme Court therefore found that the physician in *West* could be held individually liable for § 1983 violations even though his employment was based on a contractual arrangement, he was not required to work exclusively for the prison, and he was not a full-time, permanent member of the state prison medical staff. *Id.* at 55–56, 108 S.Ct. 2250.

Critical to the Supreme Court's analysis was the fact that the physician provided medical services for the state at the prison hospital within the prison itself. *Id.* at 57, 108 S.Ct. 2250. Even so, courts in this Circuit sometimes find state action even in cases where the medical care was administered away from the prison. *See Rodriguez v. Mount Vernon Hosp.,* 2010 WL 3825736, at *4 (S.D.N.Y. Sept. 7, 2010) (Report and Recommendation) (citing *Garraway v. Artuz,* 2002 WL 221584, at *6 (S.D.N.Y. Feb. 13, 2002) and *Thomas v. Arevalo,* 1998 WL 427623, at *11 (S.D.N.Y. July 28, 1998)), *adopted by* 2010 WL 3825715 (S.D.N.Y. Sept. 30, 2010); *but cf. Wilson v. King,* 2008 WL 2096593, at *1 (N.D.N.Y. May 16, 2008) (private physician who performed emergency surgery at private hospital did not act under color of state law). However, when a private doctor under contract with the state administers medical care at the prison itself, the case falls neatly under *West,* all else being equal.

■ Here, all else is equal. Plaintiff alleges that the Doctor Defendants were employed by a private medical school, NYMC, which provided care to state inmates under contract with the state. Although the Doctor Defendants were not full-time employees of the state, they did administer medical care at the prison facilities, fulfilling the state's primary constitutional obligation to its inmates. Thus, *West* is on all fours with this case; the impossibility of distinguishing it on this record perhaps explains the Doctor Defendants' total failure to even try to do so.

The cases the Doctor Defendants rely on stand for the proposition that a court-appointed public defender is not a state actor for purposes of § 1983 liability. *See, e.g., Rodriguez v. Weprin,* 116 F.3d 62, 65–66 (2d Cir.1997); *Elmasri v. England,* 111 F.Supp.2d 212 (E.D.N.Y.2000). These cases, in turn, rely on *Polk County v. Dodson,* 454 U.S. at 312, 102 S.Ct. 445, but that case was expressly distinguished in *West* itself. There, the Supreme Court expressly rejected the precise analogy the Doctor Defendants offer here:

> We disagree with the Court of Appeals [below] and [defendant-]respondent that *Polk County* dictates a conclusion that respondent did not act under color of state law in providing medical treatment to petitioner. In contrast to the public defender [at issue in *Polk County* ]. Doctor Atkins' professional and ethical obligation to make independent medical judgments did not set him in conflict with the State and other prison authorities. Indeed, his relationship with other prison authorities was cooperative. "Institutional physicians assume an obligation to the mission that the State, through the institution, attempts to achieve." (citation omitted).... Doctor Atkins' professional obligations certainly

did not oblige him to function as "the State's adversary." (citation omitted). We thus find the proffered analogy between respondent and the public defender in *Polk County* unpersuasive.

*West*, 487 U.S. at 50–51, 108 S.Ct. 2250 (footnote omitted) (quoting *Polk County*, 454 U.S. at 320, 323 n. 13, 102 S.Ct. 445).

Thus, the Doctor Defendants' motion to dismiss for failure to plead action taken under color of state law is denied. As noted, this is the only aspect of their motion properly before the Court. The Doctor Defendants' motion for summary judgment on the ground of qualified immunity is denied for failure to comport with the Court's rules, without prejudice to renewal, on a proper record, at the close of discovery. But not following my rules has forfeited their right to do so now. I will not continue to postpone Plaintiff's ability to take discovery.

To eliminate any further confusion, the only issue that I will decide on such a motion is whether, accepting *Plaintiff's* account of the events as true, the Doctor Defendants are entitled to qualified immunity. *Stephenson v. Doe*, 332 F.3d 68, 78 (2d Cir.2003). Thus, a "proper record" will consist of testimony from Marrero and Plaintiff concerning Marrero's medical treatment at the Westchester DOC. It appears from the Complaint that both of them underwent an examination under New York's General Municipal Law § 50–h (Felix Decl., Ex. A, ¶¶ 20, 22). so the Court assumes such testimony is available. While the Doctor Defendants are free to supplement Plaintiffs account of their treatment with any relevant, non-conflicting evidence that they can offer, any disagreement of material fact that they inject into the record (such as denying Plaintiff's account of their behavior) will require denial of their motion.

### B. Yozzo

The County moves to dismiss Plaintiff's § 1983 claim against Yozzo. As clarified in Plaintiffs opposition to the motion, the claims against Yozzo are the same as those against the Doctor Defendants.

■ The County's sole argument raised on its Rule 12(b)(6) motion is that Plaintiff has failed to plead Yozzo's personal involvement in the alleged constitutional violation that underlies the § 1983 claim. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (internal quotation marks and citation omitted).

Here, Plaintiff clearly alleges at least two instances in which Yozzo was personally involved in the alleged deprivation of necessary medical care.

■ First, Plaintiff alleges that she asked Yozzo for copies of Marrero's medical records. She hoped to use these to have Marrero's parole restored and to seek a second medical opinion. Doing so might have given Marrero an opportunity to begin cancer treatment sooner than he did. However, Yozzo denied or delayed responding to these requests. (Felix Deck, Ex. A, ¶¶ 59–60.) This can be considered personal involvement in an alleged constitutional violation, on the theory that the Doctor Defendants and Yozzo allowed Marrero's cancer to progress beyond a treatable stage, with Yozzo's refusal to provide records forming part of this allegedly reckless course of conduct. The evidence may not bear that out, but I am deciding a motion addressed to the pleading.

Second, Plaintiff alleges that she asked Yozzo to provide Marrero with Ensure (a liquid dietary supplement), and offered to

supply it to Westchester DOC at her own cost, but that Yozzo expressly denied this request as well. (*Id.* ¶ 61.) Construing the pleadings generously. Plaintiff alleges that *Yozzo* denied sustenance to a starving and rapidly deteriorating man, and that her culpable mental state can be inferred from the senselessness of the denial. Thus, assuming that an underlying constitutional violation has been pleaded—an assumption the County does not challenge—Yozzo's personal involvement in the violation is fairly obvious.

The only hint of an argument that Plaintiff failed to plead an underlying constitutional violation is a single sentence, appended to the end of the County's opening brief, which is otherwise devoted completely to its "personal involvement" argument: "Even assuming the aforementioned allegations [concerning Yozzo's conduct] are true[,] they simply do not rise to the level of a constitutional violation." (County's Br. at 10.) In its Reply, the County does no more than repeat its one sentence "argument" that any personal involvement Yozzo did have was not sufficient to violate Marrero's rights. In neither brief does the County discuss the elements of a claim for deliberate indifference to serious medical needs, or explain why the allegations of the complaint fail to satisfy that standard.

The County cannot expect that one throwaway line at the end of its brief suffices to raise an argument that the Court can or should decide. To do so would be completely unfair to Plaintiff, who would have no opportunity to make responsive arguments, thus forcing the Court to make those arguments (from scratch) as well. This, of course, would be doubly inappropriate, because this Court is a neutral arbiter of actual disagreements between parties, not an unpaid advocate for both sides of a non-dispute. Rather, as Plaintiff correctly points out in her opposi-

tion, "defendants have failed to move for the dismissal of the deliberate indifference to serious medical needs claim against June Yozzo. Therefore, that claim must stand." (Pl.'s Opp. At 15).

Thus, I will not decide whether Plaintiff has adequately pleaded a claim for deliberate indifference to Marrero's serious medical needs. To the extent that she has, she has also pleaded sufficient facts from which Yozzo's personal involvement in that violation could be established. Thus, the County's motion to dismiss on Yozzo's behalf is DENIED.

Insofar as Yozzo indicated her intention to move for summary judgment based on qualified immunity, she is free to do so at the close of discovery. Because Yozzo also failed to perfect her bare motion for summary judgment on this ground in accordance with my rules, she also has forfeited her ability to make this motion before plenary discovery.

### C.  County Defendants

#### 1.  Westchester County

The Complaint asserts a claim against the County under § 1983, as well as pendent state law claims for medical malpractice and wrongful death. The County has moved to dismiss the § 1983 claim only.

In *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities may be held liable under § 1983, if a plaintiff can plead and prove both (1) the existence of a municipal policy or custom, and (2) that the policy or custom directly caused the constitutional violation. *See Overhoff v. Ginsburg Dev., L.L.C.,* 143 F.Supp.2d 379, 389 (S.D.N.Y. 2001) (citing *Monell,* 436 U.S. at 658, 98 S.Ct. 2018); *see also Jones,* 557 F.Supp.2d at 416–17. The employment relationship between an offending officer and the mu-

nicipality is insufficient, by itself, to establish liability, As the Second Circuit has explained:

> alleging that a municipal policy or ordinance is itself unconstitutional is always sufficient to establish the necessary causal connection between the municipality and the constitutional deprivation, because an employee's act of enforcing an unconstitutional municipal policy may be considered the act of the municipality itself. Conversely, constitutional torts committed by city employees without official sanction or authority do not typically implicate the municipality in the deprivation of constitutional rights, and therefore the employer-employee relationship is in itself insufficient to establish the necessary causation. Thus, a city cannot be held liable under § 1983 on a theory of respondeat superior.

*Amnesty Am. v. Town of W, Hartford,* 361 F.3d 113, 125 (2d Cir.2004) (internal citations omitted); *see also Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

██ To establish a municipal policy or custom, the plaintiff may allege either (1) a formal policy, promulgated or adopted by the entity; or, (2) that an official with policymaking authority took action or made a specific decision which caused the alleged violation of constitutional rights; or (3) the existence of an unlawful practice by subordinate officials that was so permanent or well settled so as to constitute a "custom or usage," and that the practice was so widespread as to imply the constructive acquiescence of policymaking officials. *Jouthe v. City of New York,* 2009 WL 701110, at *7 (E.D.N.Y. March 10, 2009).

I reject Plaintiff's argument that she has adequately pleaded that the very persons who caused the constitutional violation— Dr. Bailey–Wallace, Dr. Goldberg, and

Yozzo-possessed "policymaking authority" with respect to how, when and to whom medical services were to be administered at the Westchester DOC. To the contrary, Plaintiff has pleaded that the Doctors were consultant employees of NYMC, who provided services to Westchester DOC inmates under a limited contract with the state. Although this is sufficient to plead action under color of law, see *West v. Atkins, supra,* it is insufficient to plead that these Doctors were the relevant policy-makers in the County. Yozzo, meanwhile, is not alleged to have any policymaking authority in the County, at least not to the extent that it would make any sense to say that Yozzo's actions were the County's actions. To the contrary, she is alleged to be a subordinate County employee with limited control over some medical decisions at the Westchester DOC; this is not sufficient to establish that her acts represent County policies or customs. Plaintiff does not argue otherwise.

██ Nevertheless, the County's motion to dismiss Plaintiff's *Monell* claim against it is denied, because Plaintiff has succeeded in pleading a municipal policy under the third method cited above— pleading a pervasive "custom or usage" of constitutional violations by subordinate officers. "For this third method of establishing the existence of a policy, a plaintiff may show 'that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.'" *Dilworth v. Goldberg,* 2011 WL 3501869, at *25 (S.D.N.Y. July 28, 2011) (Report and Recommendation) (quoting *Amnesty Am. v. Town of W. Hartford,* 361 F.3d at 126), *adopted by* 2011 WL 4526555 (S.D.N.Y. Sept. 30, 2011). The custom or usage of constitutional violations must be so pervasive that the need for corrective action can fairly be considered "obvious," such that

the supervising policymaker's failure to take such action gives rise to an inference of her deliberate indifference to inmates' constitutional rights. *Dilworth,* 2011 WL 3501869, at *25 (citing *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir. 1995)).

Plaintiff relies on a United States Department of Justice ("DOJ") Report, called "CRIPA Investigation of the Westchester County Jail, Valhalla, New York" (the "Report"), which is incorporated by reference into her Complaint. *See DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir.2010) (on Rule 12(b)(6) motion, the court may consider documents incorporated by reference into the complaint). To compile this Report, DOJ investigators visited the Westchester County DOC in February 2008, reviewed numerous documents and videotapes, and interviewed inmates and employees. (Felix Decl., Ex. A, Attachment (the "Report"), at 1.)

■ The Report, which is designed to address systematic constitutional failures, concluded that the Westchester DOC's provision of medical care to inmates was constitutionally deficient in several respects. (Report, at 19.) Although the Report was published in November 2009, high-ranking prison officials were advised of the DOJ's preliminary findings in February 2008, well before Marerro's remission to custody. The Report was published during the very months when Marrero's claims arose.

I agree with Plaintiff that the Report constitutes a sufficient allegation of a "custom" of repeated constitutional violations, which were sufficiently pervasive as to suggest acquiescence on the part of the County's policymakers. The headline finding of the Report is that "inmates do not receive adequate medical and mental health care" at the Westchester County DOC (Report at 2). While the Report

focuses on areas of medical care that do not implicate cancer diagnosis (Report, at 19–31), it chronicles failures to make proper diagnoses, refusals to order diagnostic tests, and overlooking obvious symptoms in the form of innocuous diagnoses—all of which are alleged in this case. The Report's findings were communicated to high level County officials at the facility well before Marrero's incarceration; that should have made policymakers clearly aware of the need to improve staffing and communication within the prison's medical facilities.

Indeed, Plaintiff has pleaded a failure to diagnose that is distressingly reminiscent of the problems identified in the Report. For months Marrero complained of a lump growing in his throat while he shed weight at an alarming rate and lost the ability to speak. Meanwhile, the Westchester DOC medical staff diagnosed him with innocuous maladies and assured him his symptoms would "go away," as his cancer apparently progressed beyond a treatable stage.

I thus reject the County's argument that Plaintiff has failed to plausibly allege that the "customs" identified in the Report were the "cause" of Marrero's constitutional injuries. Reading the Complaint as strongly for Plaintiff as I can, I find that she has, with the Report, pleaded that a custom of woefully inadequate diagnosis and treatment that led to a violation of Marrero's constitutional rights. Thus, the County's motion to dismiss Plaintiff's *Monell* claim is DENIED.

Plaintiff also asserts common law claims against the County for medical malpractice and wrongful death under state law, but the County has not moved to dismiss these claims.

#### 2. *Spano, Spano, Amicucci*

Andrew Spano (then County Executive), Joseph Spano (then Commissioner of the

Westchester DOC), and Amicucci (then Warden of the Westchester DOC) also move for dismissal of Plaintiff's § 1983 claim against them, on the ground that they were not personally involved in any constitutional violations. As noted above, "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983," *Farrell*, 449 F.3d at 484 (internal quotation marks and citation omitted).

Plaintiff does not oppose dismissal, because, she says, no § 1983 claim was ever asserted against these Defendants. Rather, relief is sought against them on the common law theory of "failure to supervise." (Pl.'s Opp. to County's Mot. at 15.)

■■■ In its Reply papers, the County makes, for the first time, a brief argument to dismiss the state law failure to supervise claim. However, I will not dismiss these Defendants from the case on the basis of an argument raised for the first time in Reply papers, to which the Plaintiff has not had the opportunity to respond. "Courts generally do not consider arguments raised for the first time in a reply brief." *U.S. ex rel. Sasaki v. New York Univ. Med. Ctr.*, 2012 WL 220219 (S.D.N.Y. Jan. 25, 2012) (citing *James v. Orange Cnty. Correctional Facility*, 2011 WL 5834855, at *3 (S.D.N.Y. Nov. 18, 2011)). The Complaint did not name Andrew Spano, Joseph Spano or Amicucci in either of its § 1983 claims; rather, these Defendants were named only in the pendent state law claim for "Negligent Supervision, Training, Discipline and Retention." (Felix Decl., Ex. A, ¶¶ 95–99.) Thus, the County had sufficient notice of which claims it should have moved to dismiss, and its failure to address the state law claim against Joseph Spano, Andrew Spano and Amicucci in its opening brief forecloses its attempt to do so in its Reply.

Moreover, it is premature to decide the legal sufficiency of any pendent state law claims. Thus, the motion to dismiss the § 1983 claims against Defendants Spano, Spano and Amicucci is DENIED, there being no § 1983 claims to dismiss. I will not entertain another pre-Answer motion from these defendants.

## D. New York Medical College (NYMC)

Finally, NYMC moves to dismiss the § 1983 claim against it, and argues that the Court should decline to exercise supplemental jurisdiction over Plaintiff's pendent state law claims. NYMC also argues that some of the those state law claims are not sufficiently pleaded under Rule 12(b)(6).

I agree with NYMC that the § 1983 claim against it must be dismissed. However, I will continue to exercise supplemental jurisdiction over any state law claims against NYMC premised on its employees' actions and the theory of respondeat superior.

### 1. Section 1983 claim

"Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, case law has extended the *Monell* doctrine to private § 1983 defendants acting under color of state law." *Dilworth v. Goldberg*, 2011 WL 3501869, at *24 (S.D.N.Y. July 28, 2011) (Report and Recommendation) (citing *Rojas v. Alexander's Dep't Store*, 924 F.2d 406, 408–09 (2d Cir.1990), *cert. denied* 502 U.S. 809, 112 S.Ct. 52, 116 L.Ed.2d 30 (1991) (other citations omitted), *adopted by* 2011 WL 4526555 (S.D.N.Y. Sept. 30, 2011)).

■■■ Nonetheless, as is true for municipal defendants, "Private employers are not liable under § 1983 for the constitu-

tional torts of their employees." *Rojas,* 924 F.2d at 408; see also *Whalen v. Allers,* 302 F.Supp.2d 194, 202–03 (S.D.N.Y.2003), Rather, to state a § 1983 claim against a private entity, a plaintiff must allege that an action pursuant to some official policy caused the constitutional deprivation. *Rojas,* 924 F.2d at 408–09; *see also Dilworth,* 2011 WL 3501869, at *24 (collecting cases).

Here, accepting Plaintiff's argument that NYMC acted under color of State law by virtue, of its agreement to administer medical services to inmates at the Westchester DOC, Plaintiff does not allege the existence of any "policy or custom" at NYMC that might render it liable under § 1983.

■ Although the allegations in the Complaint with respect to NYMC's *Monell* liability are identical to the allegations against the County, these Defendants are differently situated. First, the Report does not mention NYMC at all, and certainly does not suggest routine constitutional failures on the part of its doctors. Instead, the Report praises the Westchester DOC's use of outside services, such as the WMC. (Report at 19.) Thus, the Report does not contain an allegation of the existence of a policy or custom of constitutional violations at NYMC or among its employees providing services at the Westchester DOC.

For the same reason, the Report does not provide notice to any policymakers at NYMC—none of whom are identified in the Complaint or the Report. Even if the Report's findings of inadequacy reach NYMC's provision of services, there is no allegation that the Report's findings were communicated to NYMC policymakers, in either their preliminary or final form. In the absence of notice of ongoing violations, NYMC policymakers cannot be found to have acquiesced in them, or to have done

so with deliberate indifference to the inmates' constitutional rights.

Finally, even if I were to assume that the Report's findings reach NYMC's provision of medical care, and that policymakers at NYMC were aware of those findings, I still would not find a sufficient allegation of deliberate indifference, because there is no allegation that NYMC policymakers could have done anything to remedy the inadequate provision of care. There is no allegation that NYMC had control over the level of staffing that the Westchester DOC provides, or any responsibility for the training or supervision of the facility's employees. There is no allegation that NYMC could have provided the additional funding necessary to raise the prison's facilities and staff to the constitutionally required levels. Thus, even if NYMC knew of the problems at the Westchester DOC, it was not in a position to remedy them, so its failure to remedy does not give rise to a plausible inference of deliberate indifference on its part.

Judge Gorenstein reached the same conclusion in a recent case involving a *Monell* claim by a Westchester DOC inmate against NYMC. There, as here, no specific allegations were made about what NYMC "policymakers" knew, or should have known, about alleged widespread failures among its employees providing care at the Westchester DOC. The plaintiff there relied primarily on the same DOJ Report that Plaintiff relies on exclusively here. Judge Gorenstein found that these allegations fell well short of establishing a "custom or policy" at NYMC that caused the plaintiff's constitutional injuries, or that NYMC had failed adequately to train its employees:

the allegations in the complaint do not show that NYMC was deliberately indifferent to the unconstitutional acts of its employees. There are no allegations re-

garding what specific actions were known to a policymaker at NYMC, let alone facts showing that NYMC had ignored past complaints about the doctors' conduct. While plaintiffs contend that NYMC should have known about the unconstitutional conduct from the DOJ preliminary findings, this conclusory allegation is not enough to establish that NYMC was aware of and deliberately ignored the unconstitutional acts of its employees. There is not even an allegation that these findings mentioned NYMC's employees. Instead, plaintiffs allege only that the findings discussed general problems at the Jail Thus, it cannot be said that the findings put NYMC on notice of their employees' conduct.

*Dilworth*, 2011 WL 3501869, at *26 (internal citations omitted). Judge Holwell adopted Judge Gorenstein's conclusion, pointing out in addition that any policy that may be established by the DOJ Report was not the cause of the constitutional injuries complained of. *Dilworth v. Goldberg*, 2011 WL 4526555, at *9–10 (S.D.N.Y. Sept. 30, 2011), The same result follows here.

Thus, Plaintiffs § 1983 claim against NYMC is dismissed.

### 2. *State law claims*

■ On the other hand, I am not willing to dismiss the pendent state law claims against NYMC that depend on the doctrine of respondeat superior. "The doctrine of respondeat superior 'renders a master vicariously liable for a tort committed by his servant while acting within the scope of his employment.'" *Dilworth*, 2011 WL 3501869, at *29 (quoting *Riviello v. Waldron*, 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (1979)).

■ Plaintiff alleges that Drs. Bailey Wallace and Goldberg were NYMC em-

ployees when they took the actions that gave rise to Marrero's § 1983 claim, performing services under a contract between NYMC and the Westchester DOC. Those same actions form the basis of state law claims for malpractice, wrongful death, and infliction of emotional distress against the Doctor Defendants. As long as these state law claims are before this Court, the corresponding state law claims against NYMC should be here as well.

In short, "The fact that all federal claims against NYMC are being dismissed is insufficient to permit the Court to decline to exercise supplemental jurisdiction [over pendent state law claims] inasmuch as other federal claims remain in the case and the state law claims 'form part of the same case or controversy.'" *Dilworth*, 2011 WL 3501869, at *26 (quoting 28 U.S.C. § 1367(a)), Thus, NYMC's motion to dismiss the pendent state claims against it is denied.

### E. *Plaintiffs motion for limited, expedited discovery*

Following NYMC's filing of its motion to dismiss, Plaintiff filed an ex parte motion for limited discovery on the issue whether NYMC was a "state actor" for purposes of § 1983 due to its contracts with the County to provide necessary medical services to Westchester DOC inmates. (ECF No. 35); *see West*, 487 U.S. at 42, 108 S.Ct. 2250. However, I assumed above that NYMC could be treated as a state actor for the same reasons that the Doctor Defendants could. Although this assumption could not save Plaintiff's § 1983 claim against NYMC, it did render moot its motion for limited discovery into the nature of any contractual arrangements. Thus, its motion is denied.

### CONCLUSION

Drs. Bailey–Wallace and Goldberg's motion to dismiss (ECF No. 48) is DENIED.

All claims against those Defendants remain in the case.

The County's motion to dismiss (ECF No. 29) is DENIED. The § 1983 claim against June Yozzo as an individual, and the *Monell* claim against the County, are both adequately pleaded, and the pendent state law claims against all County Defendants are sufficiently related to the remaining § 1983 claims for this Court to continue to exercise supplemental jurisdiction over them.

NYMC's motion is dismiss (ECF No. 18) is GRANTED in part and DENIED in part. The § 1983 claim against it is dismissed, but the Court retains jurisdiction over all pendent state law claims.

Plaintiffs motion for limited, expedited discovery (ECF No. 35) is DENIED as moot.

Dr. Bailey–Wallace, Dr. Goldberg, and Yozzo have signaled their intention to move for summary on qualified immunity grounds. As discussed above, they are free to do so at the close of discovery. Should they choose to do so, the motion(s) must be premised on the assumption that Plaintiff's telling of the story is the correct one. If, on that account, Defendants would not be entitled to qualified immunity, or if Defendants dispute the truth of Plaintiff's account on any issue of material fact, summary judgment will be denied.

Finally, I have heard nothing about the status of the WCHCC or the WMC in this case. Insofar as there has been no motion for their dismissal from this case, they will remain in at least until a decision is made on the issue of qualified immunity.

The Clerk of Court is directed to remove Docket numbers 18, 29, 35 and 48 from the Court's list of open motions.